[No. G041732. Fourth Dist., Div. Three. Aug. 31, 2011.]

JERRY LLOYD MARTIN et al., Plaintiffs and Appellants, v. PACIFICARE OF CALIFORNIA et al., Defendants and Respondents.

1392

COUNSEL

Shernoff Bidart Darras Echeverria, Michael J. Bidart, Ricardo Echeverria; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiffs and Appellants.

Sedgwick, David M. Humiston, Christina J. Imre, Douglas J. Collodel; Brownstein Hyatt Farber Schreck, Edward A. Stumpp; Horvitz & Levy and Mitchell C. Tilner for Defendants and Respondents.

OPINION

ARONSON, Acting P. J.—Plaintiffs Jerry Jay Martin, Jerry Lloyd Martin, Tressa Brown, and Lisa Vindell (collectively the Martins) appeal from a

judgment the trial court entered after granting a nonsuit motion in favor of defendants PacifiCare of California doing business as Secure Horizons and PacifiCare Health Systems, LLC (collectively PacifiCare). In this insurance bad faith action, the Martins sued PacifiCare based on delays their mother or wife, Elsie Martin (Elsie),[1] experienced while seeking treatment for a cerebral aneurysm. Elsie died before receiving the treatment she sought.

At trial, PacifiCare moved for nonsuit based on the recent decision in *Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56 [86 Cal.Rptr.3d 374] (*Watanabe*), which held Health and Safety Code section 1371.25 (section 1371.25) barred a cause of action seeking to hold a health care service plan vicariously liable for the acts or omissions of the health care provider who agreed to deliver medical care to the plan's subscribers. (*Watanabe*, at pp. 63–64.) The trial court granted the motion, finding section 1371.25 barred the Martins' claims because they sought to hold PacifiCare vicariously liable for the acts or omissions of Bright Medical Group (Bright), the health care provider PacifiCare contracted with to provide Elsie medical care and to make all initial determinations regarding whether any particular care or treatment was medically necessary.

The Martins contend we must reverse the trial court's judgment because *Watanabe* misinterpreted section 1371.25. As the Martins interpret the statute, section 1371.25 bars health care service plans from requiring medical providers to hold the plans harmless for the plan's own acts or omissions; it does not bar common law or other liability theories against health care service plans. The Martins also argue section 1371.25 does not apply to their claims because insurance bad faith is a direct liability theory, not a vicarious liability theory.

We agree with *Watanabe* that section 1371.25's plain language prevents a health care service plan from being held vicariously liable for a medical provider's acts or omissions. Our examination of section 1371.25's legislative history further supports that conclusion. We also reject the Martins' contention that insurance bad faith is necessarily a direct liability theory. Regardless how they label their claim, the Martins sought to hold PacifiCare vicariously liable for Bright's acts or omissions. Accordingly, we affirm the trial court's judgment.

---

[1] We refer to Elsie by her first name to avoid any confusion with other members of her family. No disrespect is intended. (*Fazzi v. Klein* (2010) 190 Cal.App.4th 1280, 1282, fn. 1 [119 Cal.Rptr.3d 224].)

I

## FACTS AND PROCEDURAL HISTORY

### A.  *PacifiCare's Secure Horizons Plan*

PacifiCare is a licensed health care service plan under California's Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act; Health & Saf. Code, § 1340 et seq.).[2] The Knox-Keene Act defines a "health care service plan" as "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f)(1).) PacifiCare is not licensed to practice medicine and it does not directly provide medical care to its subscribers. (Civ. Code, § 3428, subd. (c); Health & Saf. Code, § 1395, subd (b).) Instead, PacifiCare contracts with "providers"[3] to deliver medical care to subscribers who enroll in its plans. Secure Horizons is the service plan PacifiCare offers to subscribers eligible for benefits under the federal Medicare Advantage program (see generally 42 U.S.C. § 1395w-21 et seq.).

The Medicare Advantage program (previously known as Medicare+Choice) is a federal program permitting Medicare recipients to enroll in private insurance plans, with Medicare paying all or most of the insurance premiums in lieu of paying Medicare benefits directly to health care providers. PacifiCare contracts with the federal agency that administers Medicare to receive a flat monthly payment for each person enrolled in its Secure Horizons plan. In return, PacifiCare arranges to provide its subscribers a specified range of medical services through its network of medical providers. (*Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158, 1163 [102 Cal.Rptr.3d 379].)

Bright is a medical service provider PacifiCare hired to provide medical services to PacifiCare's subscribers. The contract between PacifiCare and Bright requires Bright to provide medical care to Secure Horizons subscribers who select a member of Bright's medical group as their primary care physician. The contract also requires Bright to perform utilization review on

---

[2] We refer to PacifiCare as a health care service plan or plan throughout this opinion because that is the terminology used in the Knox-Keene Act. Health care service plans also are commonly referred to as HMO's or health maintenance organizations. (*Watanabe, supra*, 169 Cal.App.4th at p. 59, fn. 3.)

[3] " 'Provider' means any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services." (Health & Saf. Code, § 1345, subd. (i).)

PacifiCare's behalf. Utilization review is the process physicians use to determine whether a particular service or treatment is medically necessary and therefore covered by the applicable health care service plan. Although PacifiCare delegated this function to Bright, it retained final authority to determine whether Bright's physicians should provide a particular service or treatment. All Secure Horizons subscribers have the right to appeal any utilization review decision to PacifiCare and PacifiCare may reverse any decision Bright makes. PacifiCare pays Bright a negotiated, flat monthly fee (based on a percentage of Medicare's payments to PacifiCare) for each Secure Horizons subscriber who selects a Bright physician as his or her primary care physician. Bright must cover the costs of all necessary medical care, whether a Bright physician provides the care or refers the subscriber to another health care provider.

## B.  *Elsie's Secure Horizons Contract*

By enrolling in PacifiCare's Secure Horizons plan, Elsie agreed to receive her medical care (except certain emergency and urgently needed services not applicable in this case) from PacifiCare's medical providers. Her contract with PacifiCare required her to choose a primary care physician, and emphasized the doctor Elsie selected would be responsible for providing or arranging all her medical care. The contract limited Elsie to specialists and facilities that belonged to the same medical group as the physician she selected.

The contract explained PacifiCare's contractual relationship with Medicare and the providers Elsie would look to for her medical care. It also explained the utilization review process that determined whether to approve any medically necessary service or treatment. Finally, the contract described Elsie's right to contact PacifiCare with any questions or concerns regarding her health care and to appeal any utilization review decision, including an expedited appeal in case of emergency. Through its contracting process with PacifiCare, Medicare reviewed and approved PacifiCare's contract with its Secure Horizons subscribers.

When she enrolled in Secure Horizons, Elsie selected Bright's Dr. Ronald Galbreath as her primary care physician.

## C.  *Elsie's Medical Treatment*

In late August 2003, Presbyterian Intercommunity Hospital, an in-network hospital affiliated with Bright, admitted Elsie for a neurological evaluation. An MRI (magnetic resonance imaging) and MRA (magnetic resonance angiogram) revealed Elsie had a large aneurysm in her left middle cerebral artery. An aneurysm is a weakening or ballooning of a blood vessel.

Bright's affiliated physicians and facilities lacked the expertise to treat Elsie's aneurysm. Consequently, Galbreath requested that Bright authorize treatment out of network at the University of Southern California Medical Center (USC). Bright approved the request and Elsie saw Dr. Steven Giannotta, a neurosurgeon, at USC.

Giannotta described three treatment options for Elsie's aneurysm: (1) surgery on the affected blood vessel to prevent blood from enlarging and rupturing the aneurysm; (2) coil embolization, a process where increasingly smaller platinum coils are threaded into the aneurysm through a catheter to block blood flow and prevent the aneurysm from rupturing; and (3) doing nothing. Giannotta recommended the coil embolization option and referred Elsie to Drs. George Teitelbaum and Donald Larsen, the neurointerventional radiologists who performed coil embolization procedures at USC.

To determine whether coil embolization is a viable treatment option for their patients, Teitelbaum and Larsen perform a cerebral angiogram, which involves threading a diagnostic catheter through an artery to the aneurysm to determine whether the aneurysm has an adequate "neck" to permit coil embolization. If the aneurysm is amenable to the procedure, Teitelbaum and Larsen place the patient under general anesthesia, replace the diagnostic catheter with a guiding catheter, and perform the coil embolization procedure during the same visit.

On September 25, 2003, Giannotta sent a letter to Galbreath seeking approval for Elsie to undergo an angiogram and coil embolization with Teitelbaum and Larsen. Galbreath forwarded the request to Bright's utilization review committee. On October 7, 2003, Dr. Eric Flanders, a family practitioner and Bright's utilization review committee chairman, denied the request. Instead, Flanders approved a cerebral angiogram to be performed at Presbyterian Intercommunity Hospital, Bright's in-network hospital. Flanders did not consult with either Giannotta or Galbreath before making his decision.

Bright sent Elsie a denial letter explaining the medical documentation her doctors submitted failed to support the request and it required further diagnostic testing before Bright would refer Elsie to an out-of-network provider. The denial letter included a lengthy explanation regarding Elsie's right to appeal Bright's utilization review decision to PacifiCare and how Elsie could exercise that right.

At trial, Flanders conceded the letter's statements regarding the basis for the denial were false because the documentation adequately supported the request and Elsie already had been referred to USC for her aneurysm.

Flanders also conceded the USC referral was medically necessary and covered by PacifiCare's Secure Horizons plan.

Galbreath received a copy of the denial letter, but he did not actually see it until October 24, 2003, when Elsie's husband brought it to his attention during Elsie's office visit. Elsie's husband asked Galbreath to intervene on her behalf. Galbreath asked Bright's medical director, Dr. David Wortham, to reconsider the denial, but Wortham refused because he found the denial reasonable.

On November 12, 2003, Bright sent a fax to Giannotta at USC explaining it modified the requested consultation with Teitelbaum and Larsen to a cerebral angiogram at Presbyterian Intercommunity Hospital. Giannotta responded by fax that same day, explaining, "We need a new authorization for Elsie to see Dr. [*sic*] Larsen and Teitelbaum. They are endo vascular neuro radiologists who plan on treating the aneurysm if amendable [*sic*] not for a diagnostic angio gram only but potential treatment also. Requesting authorization for diagnostic angio with possible coil embolization." He marked this request "stat," meaning "hurry up," but he never received any response.

Giannotta sent the fax because a cerebral angiogram at Presbyterian Intercommunity Hospital would delay Elsie's treatment and force her to needlessly undergo two cerebral angiograms. Teitelbaum and Larsen still would perform a cerebral angiogram using USC's more advanced equipment to determine whether coil embolization could treat Elsie's aneurysm and then immediately perform the procedure.

Although it received Giannotta's fax, Bright took no action because its utilization review staff failed to bring it to any physician's attention. Wortham testified he did not see the fax until nearly a month later and Galbreath and Flanders testified they did not see it until after the Martins filed this litigation. At trial, Flanders conceded Giannotta's fax showed the cerebral angiogram he approved at Presbyterian Intercommunity Hospital was not reasonable and, if he had seen the fax, would have approved the referral to Teitelbaum and Larsen.

Elsie underwent the cerebral angiogram at Presbyterian Intercommunity Hospital on November 25, 2003. On December 9, 2003, Galbreath submitted a new request to Bright's utilization review committee for Elsie to consult with Teitelbaum and Larsen at USC. Bright approved that request and Elsie saw Teitelbaum and Larsen on December 15, 2003.

On December 16, 2003, Teitelbaum submitted a "rush" request for Bright's approval to conduct an angiogram and coil embolization on Elsie. Bright

approved the request on December 18, 2003. When USC received the approval, it scheduled Elsie as a routine procedure for the next available date, February 4, 2004. Teitelbaum testified he would have scheduled the procedure immediately if he thought Elsie's condition was urgent.

On January 10, 2004, Elsie's aneurysm burst and her treating physicians informed Elsie's family her condition was terminal. The doctors removed Elsie from life support and she died on January 16, 2004. Ironically, when Jerry returned home from the hospital on January 10, 2004, his mail contained a letter from Bright stating her treatment with Teitelbaum and Larsen had been approved and scheduled for February 4, 2004.

At no time did Elsie or anyone acting on her behalf contact PacifiCare to discuss Elsie's medical care or challenge Bright's utilization review of Elsie's treatment requests.

D.  *The Trial Court Proceedings*

The Martins sued PacifiCare in April 2005.[4] They did not name Bright or any of its physicians as defendants. The operative second amended complaint alleged two causes of action based on insurance bad faith. One cause of action alleged PacifiCare breached the implied covenant of good faith and fair dealing and the second sought damages for wrongful death on behalf of Elsie's husband and children. The Martins' complaint alleged PacifiCare was liable for Bright's delays in approving the angiogram and coil embolization at USC. PacifiCare filed a cross-complaint against Bright for indemnity.

PacifiCare moved for summary judgment on the ground section 1371.25 barred the Martins' causes of action. PacifiCare argued it could not be vicariously liable because Bright made all utilization review decisions regarding Elsie's medical care and neither Elsie nor anyone acting on her behalf brought the matter to PacifiCare's attention. According to PacifiCare, a vicarious liability theory failed as a matter of law because section 1371.25 barred health care service plans from being held liable for a health care provider's acts or omissions.

The trial court denied the motion because no reported case interpreted section 1371.25 to bar vicarious liability theories against health care service plans. The court found a triable issue of fact existed on whether PacifiCare and Bright's contract created an agency relationship making PacifiCare vicariously liable for Bright's acts or omissions.

---

[4] During the pendency of this appeal, Elsie's husband, Jerry Jay Martin, died. We granted a motion to substitute his daughters, Lisa Vindell and Tressa Brown, as his successors in interest.

At the start of trial, the Martins agreed to a settlement with Bright and the trial court dismissed PacifiCare's indemnity cross-complaint against Bright after it found the parties agreed to the settlement in good faith under Code of Civil Procedure section 877.6.[5] During the trial, the Second District Court of Appeal published its decision in *Watanabe*, holding section 1371.25 bars any action seeking to hold a health care service plan vicariously liable for utilization review determinations the plan contractually delegated to its medical providers. (*Watanabe, supra*, 169 Cal.App.4th at pp. 63–64.) Based on *Watanabe*, the trial court granted PacifiCare's nonsuit motion and thereafter entered judgment in PacifiCare's favor. The Martins timely appealed.

II

DISCUSSION

A. *Standard of Review*

"We independently review an order granting a nonsuit, evaluating the evidence in the light most favorable to the plaintiff and resolving all presumptions, inferences and doubts in his or her favor. [Citations.] 'Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ . . . ." ' [Citation.] In other words, '[i]f there is substantial evidence to support [the plaintiff's] claim, *and* if the state of the law also supports that claim, we must reverse the judgment.' [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124–1125 [76 Cal.Rptr.3d 585], original italics.) Similarly, "[s]tatutory interpretation is a question of law that we review de novo." (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 [122 Cal.Rptr.3d 331, 248 P.3d 1185].)

B. *Section 1371.25 Precludes a Cause of Action Holding PacifiCare Vicariously Liable for Bright's Acts or Omissions*

Section 1371.25 states as follows: "A plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others. Any provision to the contrary in a contract with providers is void and unenforceable. Nothing in this section shall preclude a finding of liability on the part of a plan, any entity contracting with a plan, or a provider, based on

---

[5] PacifiCare appealed the trial court's order finding a good faith settlement and dismissing PacifiCare's cross-complaint against Bright. Our opinion in *PacifiCare of California v. Bright Medical Associates, Inc.* (2011) 198 Cal.App.4th 1451 [130 Cal.Rptr.3d 305] affirms that order.

the doctrines of equitable indemnity, comparative negligence, contribution, or other statutory or common law bases for liability." (§ 1371.25.)

The court in *Watanabe* interpreted section 1371.25 to preclude an action seeking to hold a health care service plan vicariously liable for a health care provider's acts or omissions. (*Watanabe, supra*, 169 Cal.App.4th at pp. 63–64.) The plan in *Watanabe* contracted with a provider to deliver medical care to the plaintiff and the plan's other subscribers. That contract delegated to the provider the utilization review function. Thus, the medical provider made the initial determination whether a service or treatment was medically necessary and therefore covered by the plan's policy. The plan retained the power to override the provider's utilization review decision through its established appeal or grievance procedures. (*Id.* at pp. 59–60.) The plaintiff sued the plan for breach of contract and breach of the implied covenant of good faith and fair dealing based on the *provider's* malfeasance in the utilization review function, alleging the provider unreasonably delayed and denied medically necessary care. The plan, however, did not delay or deny medical care and overturned the only utilization review decision the plaintiff brought to the plan's attention. Based on section 1371.25, the trial court instructed the jury it could find the plan liable only for the plan's own acts or omissions, but not the acts or omissions of the provider. The jury returned a verdict in the plan's favor and the plaintiff appealed.[6] (*Watanabe*, at pp. 59–62.)

The *Watanabe* court noted that the plaintiff sued the plan based solely on the *provider's* failure to give the plaintiff necessary medical care. In essence, the plaintiff sought to hold the plan vicariously liable for the provider's failings. (*Watanabe, supra*, 169 Cal.App.4th at p. 62.) The appellate court concluded, however, that section 1371.25 barred reliance on the theory of vicarious liability. As the *Watanabe* court explained, by making all plans and providers responsible for their own acts or omissions and not one another's acts or omissions, section 1371.25 barred the plaintiff from holding the plan vicariously liable for the provider's malfeasance. (*Watanabe*, at pp. 63–64.) The *Watanabe* court found section 1371.25 so "unmistakably clear in precluding the imposition of vicarious liability," it refused to consider the statute's legislative history. (*Watanabe*, at p. 64.)

---

[6] The jury returned a verdict for the plaintiff on the breach of contract cause of action and the plan on the implied covenant cause of action. (*Watanabe, supra*, 169 Cal.App.4th at p. 59.) The verdict, however, awarded the plaintiff just $65 for the cost of a single doctor visit the provider refused to approve. (*Id.* at p. 62.) The Court of Appeal found no evidence showing the plan covered that doctor visit, but the court nonetheless affirmed the judgment in its entirety because the plan did not appeal and a settlement the plaintiff reached with another party offset the $65 judgment. (*Id.* at pp. 59, 62.)

*Watanabe* is squarely on all fours with the Martins' case. PacifiCare contracted with Bright to provide medical care to its Secure Horizons subscribers. That contract delegated to Bright the utilization review function, but PacifiCare retained final authority to override Bright's decisions, assuming the subscriber appealed or otherwise brought the issue to PacifiCare's attention. The Martins claim Bright unreasonably delayed necessary medical care to treat Elsie's aneurysm, but neither Elsie nor anyone acting on her behalf notified PacifiCare of the delays. PacifiCare did nothing to delay or deny any medical care Elsie sought. As the trial court explained in granting PacifiCare's nonsuit motion, "the whole theory of this case was that . . . . Bright was the agent of PacifiCare." In other words, the Martins based their entire case on a vicarious liability theory. Accordingly, *Watanabe* compelled the trial court's decision that section 1371.25 barred the Martins' claims.

The Martins contend *Watanabe* is wrongly decided because section 1371.25 does *not* preclude holding a health care service plan vicariously liable for a medical provider's acts or omissions. According to the Martins, section 1371.25 only bars a plan from enforcing a contractual provision that requires a provider to hold the plan harmless for the plan's own acts or omissions. As the Martins interpret section 1371.25, the second sentence is the key to determining the statute's overall meaning and effect. The Martins contend the first sentence's declaration that plans and providers are liable only for their own acts or omissions merely forms the "predicate" to the second sentence's prohibition against hold harmless provisions. The third sentence then preserves all " 'statutory or common law bases for liability,' " so the net effect is that hold harmless provisions are barred, but no specific liability theory against a plan is precluded.

*Watanabe*, however, specifically rejected the argument section 1371.25's third sentence preserves liability theories otherwise barred by the statute's first sentence: "We do not think that, having precluded the imposition of vicarious liability in the first and second sentences of section 1371.25, the Legislature intended to reimpose it by means of the third sentence. This would be an absurd result by any measure. [Citation.] Thus, it is clear that under the third sentence an entity that has committed an act or omission for which it is liable remains liable for that act or omission, *even if it shares liability with another entity*. All three doctrines enumerated in the third sentence of section 1371.25—equitable indemnity, comparative negligence and contribution—are instances when one or more parties are liable for an act or omission. [Citations.]" (*Watanabe, supra,* 169 Cal.App.4th at p. 64, original italics.)

Stated another way, the third sentence preserves statutory and common law theories allocating liability among multiple parties whose acts or omissions

contribute to the same injury. It does not preserve vicarious liability or any other theories holding a party liable for another's acts or omissions. Although *Watanabe* does not use the phrase, it applied the doctrine of *ejusdem generis*, a hoary rule of statutory construction. ■ " '*Ejusdem generis* applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is "restricted to those things that are similar to those which are enumerated specifically." ' [Citation.] 'The canon presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage.' [Citations.]" (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [64 Cal.Rptr.3d 693, 165 P.3d 488].)

The Martins contend the *Watanabe* court misinterpreted the statute because it refused to consider section 1371.25's legislative history. The Martins argue that history shows the Legislature intended only to bar a health care service plan from requiring a medical provider to indemnify it. A careful review of section 1371.25's legislative history supports *Watanabe*'s interpretation, however.[7]

■ The Legislative Counsel's Digest for section 1371.25 makes clear the statute is not limited to barring hold harmless provisions in a contract between a plan and its medical providers. Rather, the purpose also is to limit liability so plans and providers are liable for their own acts or omissions, but not others' acts or omissions: "This bill would, with certain exceptions, require a plan, entity contracting with a plan, and providers to each be responsible for their own acts or omissions and not be liable for the acts or omissions of, or the costs of defending, others. This bill would declare that contractual provisions to the contrary are void and unenforceable." (Legis. Counsel's Dig., Assem. Bill No. 1840 (1995–1996 Reg. Sess.) 5 Stats. 1995, Summary Dig., p. 323.) Although the Legislative Counsel's Digest is not binding on this court, it is nonetheless "entitled to great weight." (*Jones v.*

---

[7] We judicially notice of the legislative history materials regarding section 1371.25 that PacifiCare submitted on its earlier writ petition in this case (*PacifiCare of California v. Superior Court* (Oct. 16, 2008, G040978)). Both sides rely on these legislative history materials and do not object to their use. We may judicially notice these materials based on the parties' request or our own motion. (*People v. Soto* (2011) 51 Cal.4th 229, 239, fn. 6 [119 Cal.Rptr.3d 775, 245 P.3d 410]; *People v. Indiana Lumbermens Mutual Ins. Co.* (2010) 49 Cal.4th 301, 309, fn. 6 [110 Cal.Rptr.3d 4, 231 P.3d 909]; Evid. Code, § 452, subd. (c).)

*Watanabe* refused to consider any legislative history materials because it found section 1371.25 unmistakably clear. (*Watanabe, supra,* 169 Cal.App.4th at p. 64.) Both the United States and California Supreme Courts have stated that legislative history materials may properly be considered to confirm or bolster a court's interpretation of even an unambiguous statute. (*Samantar v. Yousuf* (2010) 560 U.S. ___, ___, fn. 9 [176 L.Ed.2d 1047, 130 S.Ct. 2278, 2287, fn. 9]; *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 316 [93 Cal.Rptr.3d 559, 207 P.3d 20].)

*Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1170 [72 Cal.Rptr.3d 624, 177 P.3d 232].) As the Supreme Court explained in *Jones*, " 'It is reasonable to presume that the Legislature [acted] with the intent and meaning expressed in the Legislative Counsel's digest.' [Citation.]" (*Ibid.*)

The Martins ignore this statement in the Legislative Counsel's Digest and instead rely on the purpose identified when section 1371.25 was originally introduced. Section 1371.25's purpose when first proposed was to "prohibit plans and entities employed by plans to review claims from holding themselves harmless in cases in which denial of services resulted in harm to the patient." (Legis. Counsel's Dig., Assem. Bill No. 1840 (1995–1996 Reg. Sess.) as introduced Feb. 24, 1995.) In its original form, section 1371.25 read as follows: "In contracts with health care providers, health care service plans and entities employed by plans for the purpose of reviewing claims for service shall not hold themselves harmless from liability in cases in which a denial for services resulted in harm to the patient." (Assem. Bill No. 1840 (1995–1996 Reg. Sess.) § 3, as introduced Feb. 24, 1995.)

Section 1371.25's purpose and language, however, expanded as the statute worked its way through the Legislature. The Senate broadened the section to limit liability by making plans and providers liable for their own acts or omissions only. A Senate Committee on Insurance report explained, "*Amendments* have clarified that plans are not responsible for liability arising from provider negligence or malpractice." (Sen. Com. on Insurance, Analysis of Assem. Bill No. 1840 (1995–1996 Reg. Sess.) as amended June 22, 1995, p. 2, original italics & underscoring.) Similarly, a Senate Judiciary Committee report explains that section 1371.25 "specif[ies] that health plans are not responsible for liability arising from provider negligence or malpractice just as providers are not liable for the negligence of the health plan." (Sen. Com. on Judiciary, com. on Assem. Bill No. 1840 (1995–1996 Reg. Sess.) as amended Aug. 21, 1995, p. 3.) That same report explains that section 1371.25's purpose is to "provide that a health care service plan, any entity contracting with the plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others. It would further make void and unenforceable any provision to the contrary in a contract with providers." (Sen. Com. on Judiciary, com. on Assem. Bill No. 1840, *supra*, as amended Aug. 21, 1995, p. 2.) Legislative committee reports such as these " 'provide some indication of how the measure was understood at the time by those who voted to enact it.' " (*People v. Cruz* (1996) 13 Cal.4th 764, 773–774, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731].)

Shortly before the Senate's final approval, a proposed amendment sought to limit section 1371.25 to its original purpose of barring hold harmless

agreements by deleting the language that plans and providers are liable only for their own acts or omissions. (Legis. Counsel's Dig., Assem. Bill No. 1840 (1995–1996 Reg. Sess.) as amended Sept. 8, 1995; Assem. Bill No. 1840 (1995–1996 Reg. Sess.) as amended Sept. 8, 1995, § 2.) The Senate, however, rejected that amendment and retained the language that ultimately became section 1371.25. "When the Legislature rejects language from a bill which was part of it when it was introduced, it should be construed according to the final version." (*Stroh v. Midway Restaurant Systems, Inc.* (1986) 180 Cal.App.3d 1040, 1055 [226 Cal.Rptr. 153]; see also *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1107 [56 Cal.Rptr.3d 880, 155 P.3d 284] [" 'The rejection of a specific provision contained in an act as originally introduced is "most persuasive" that the act should not be interpreted to include what was left out.' "].)

Finally, the Enrolled Bill Report by the Department of Corporations acknowledged that the Legislature expanded section 1371.25 beyond its initial purpose to include provisions limiting liability for others' acts or omissions. The report explained, "Although the bill provides that certain persons are not liable for others, this provision is inconsistent with the laws of agency and employment. For instance, existing law recognizes that principal parties are liable for the acts or omissions of agents. . . . [¶] The bill's nonliability provisions may be interpreted by courts to exempt plans or providers from liability for the actions of persons acting on their behalf." The report urged the Governor to veto the bill for these reasons, but the Governor nonetheless signed it. (Cal. Dept. of Corporations, Enrolled Bill Rep. on Assem. Bill No. 1840 (1995–1996 Reg. Sess.) prepared for Governor Wilson (Sept. 14, 1995) pp. 3–4.) As the Supreme Court explained in *Elsner v. Uveges* (2004) 34 Cal.4th 915 [22 Cal.Rptr.3d 530, 102 P.3d 915], "[W]e have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent." (*Id.* at p. 934, fn. 19.)

These legislative materials demonstrate that section 1371.25 began as a measure to prevent health care service plans from requiring medical providers to hold them harmless for the plans' own acts or omissions. The Legislature, however, ultimately broadened section 1371.25 to not only prohibit hold harmless agreements, but also to bar actions seeking to hold plans and providers vicariously liable for one another's acts or omissions. Hence, as in *Watanabe*, section 1371.25 applies to prevent the Martins from holding PacifiCare vicariously liable for Bright's acts or omissions. In other words, the liability remains with the party at fault and cannot be shifted to another by a statutory or common law liability theory or a contractual hold harmless provision.

The Martins argue we should not interpret section 1371.25 to bar their bad faith claims because PacifiCare, as Elsie's insurer, owed a nondelegable duty to timely provide Elsie with all benefits due under the Secure Horizons plan. The Martins rely on *Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832 [263 Cal.Rptr. 850] (*Hughes*), which held an insurer's duty of good faith and fair dealing is nondelegable. (*Id.* at p. 848.) The Martins also cite cases holding an independent insurance adjuster is not liable to an insured for malfeasance when the insurer delegates to the adjuster the responsibility to handle the insured's claim because the adjuster is not in contractual privity with the insured. (See *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032] (*Gruenberg*) [insurance adjuster and law firm hired to adjust claim not liable for bad faith]; *Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 Cal.App.4th 249, 253 [84 Cal.Rptr.2d 799] (*Sanchez*) [independent adjuster hired to adjust claim owed no duty to insured].) From these cases, the Martins draw the conclusion an insurer must remain liable to the insured even when its delegated agent caused the insured's injury.

■ The nondelegable duty doctrine, however, does not prevent applying section 1371.25 to bar the Martins' bad faith claims. That doctrine—under which a party may delegate the performance of a duty but not the liability for its breach—is a form of vicarious liability because it holds one party liable for another's acts or omissions. (*Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 725–727 [28 Cal.Rptr.2d 672]; 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1247, pp. 634–635.) Consequently, section 1371.25 applies to prevent the Martins from holding PacifiCare vicariously liable based on a nondelegable duty theory, just as it would under any other vicarious liability theory. (*Watanabe, supra*, 169 Cal.App.4th at p. 68.)

Moreover, the cases the Martins cite are readily distinguishable because they do not involve a statutory scheme that expressly authorizes an insurer to delegate a duty to a third party while also barring the insurer from liability for that third party's acts or omissions. As *Watanabe* explains, the Health and Safety Code not only prevents health care service plans from being held liable for a health care provider's acts or omissions, it also specifically authorizes and regulates health care service plans' delegation of the utilization review function to health care providers. (*Watanabe, supra*, 169 Cal.App.4th at pp. 65–66 [discussing Health & Saf. Code, §§ 1371.25 and 1367.01].) The *Hughes* case the Martins cite involved a bad faith claim against a medical insurer, but it was decided before the Legislature enacted section 1371.25 or

the Health and Safety Code sections authorizing a plan to delegate the utilization review function.[8] (*Watanabe*, at pp. 66–67.)

■ Finally, the Martins argue we should not permit PacifiCare to contract with an insured to arrange health care service, receive the premiums on that contract, and then avoid any liability to the insured by delegating its responsibilities to a third party. PacifiCare, however, may not escape all liability by delegating its responsibilities. Civil Code section 3428 makes all health care service plans liable for harm a subscriber suffers when the plan fails to exercise ordinary care and denies, delays, or modifies health care services.[9] Civil Code section 3428 requires subscribers to exhaust the appeals process with the plan before raising a claim.[10] (*Watanabe, supra*, 169 Cal.App.4th at p. 66.)

Here, PacifiCare's delegation of the utilization review function to Bright did not bar the Martins' claims. Rather, Elsie's failure to invoke PacifiCare's appeal or grievance process barred the subsequent claims. Had Elsie or someone acting on her behalf contacted PacifiCare and involved it in the utilization review process, the Martins could have asserted a claim under Civil Code section 3428 and avoided Health and Safety Code section 1371.25's bar on vicarious liability because PacifiCare's own conduct would have been at issue, assuming PacifiCare had acted negligently. The Martins do not explain

---

[8] The Martins also cite *Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950 [24 Cal.Rptr.3d 447], which held that a triable issue of material fact existed regarding whether a health care service plan breached its duty of good faith and fair dealing by unreasonably delaying medical care. (*Id.* at p. 956.) *Watanabe*, however, distinguished *Kotler* on the ground the insured involved the insurer in the utilization review process by appealing two of the medical provider's decisions to the insurer. (*Watanabe, supra*, 169 Cal.App.4th at p. 67.) We distinguish *Kotler* on that same ground and also on the ground that *Kotler* did not address section 1371.25.

[9] Civil Code section 3428, subdivision (a), states as follows: "For services rendered on or after January 1, 2001, a health care service plan or managed care entity, as described in subdivision (f) of Section 1345 of the Health and Safety Code, shall have a duty of ordinary care to arrange for the provision of medically necessary health care service to its subscribers and enrollees, where the health care service is a benefit provided under the plan, and shall be liable for any and all harm legally caused by its failure to exercise that ordinary care when both of the following apply: [¶] (1) The failure to exercise ordinary care resulted in the denial, delay, or modification of the health care service recommended for, or furnished to, a subscriber or enrollee. [¶] (2) The subscriber or enrollee suffered substantial harm."

[10] In relevant part, Civil Code section 3428, subdivision (k), states as follows: "(1) A person may not maintain a cause of action pursuant to this section against any entity required to comply with any independent medical review system or independent review system required by law unless the person or his or her representative has exhausted the procedures provided by the applicable independent review system. [¶] (2) Compliance with paragraph (1) is not required in a case where either of the following applies: [¶] (A) Substantial harm, as defined in subdivision (b), has occurred prior to the completion of the applicable review. [¶] (B) Substantial harm, as defined, in subdivision (b), will imminently occur prior to the completion of the applicable review."

why holding Bright liable for its own delays in approving the angiogram and coil embolization at USC undermines the Legislature's policy choices in section 1371.25. Bright may not be liable for bad faith given that it did not have an insurance contract with Elsie, but the Martins do not argue Bright escapes liability on other theories. We need not decide what liability theories are available because the Martins did not sue Bright.

■ The Martins' argument that PacifiCare should not be permitted to avoid liability by delegating its responsibilities is a policy argument more appropriately directed to the Legislature. The Legislature enacted the statutory scheme authorizing PacifiCare to delegate its utilization review function and preventing PacifiCare from being held liable for Bright's acts or omissions. It is not our role to question these statutes or the public policies underlying them. Without doubt, this case presents a truly tragic set of circumstances, but we cannot rewrite a statute no matter how tragic the result. We are limited to construing statutes based on the plain meaning of their words and the legislative intent disclosed through their histories. As explained above, section 1371.25's plain language precludes holding PacifiCare vicariously liable and the statute's legislative history supports that result. The trial court properly granted PacifiCare's nonsuit motion.

C. *The Martins Failed to Establish Any Direct Liability Theory That Would Avoid Section 1371.25's Bar on Vicarious Liability*

The Martins assert their claims survive section 1371.25's vicarious liability bar because they based their insurance bad faith claims on direct liability. The Martins contend PacifiCare is directly liable for its bad faith because it is the only party subject to bad faith liability. According to the Martins, neither Bright nor any other third party to which PacifiCare delegated its responsibilities can be liable for bad faith because they were not in contractual privity with Elsie. (See *Gruenberg, supra*, 9 Cal.3d at p. 576; *Sanchez, supra*, 72 Cal.App.4th at p. 253.) The Martins therefore conclude that PacifiCare's bad faith liability is direct liability.

■ This argument misses the mark. Potential liability on a bad faith claim does not define whether the claim is based on vicarious or direct liability. Rather, the conduct giving rise to the bad faith claim defines whether the liability is vicarious or direct. A claim is based on vicarious liability when a party free from fault is held liable for another party's acts or omissions. (See generally *King v. Ladyman* (1978) 81 Cal.App.3d 837, 842–843 [146 Cal.Rptr. 782].) A claim is based on direct liability when a party is held liable for its own acts or omissions. (See generally *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 205 [115 Cal.Rptr.2d 853, 38 P.3d 1081].)

Here, the Martins fail to point to any act or omission by PacifiCare that gave rise to their bad faith claims. Instead, the Martins repeatedly point to Bright's acts or omissions in performing the utilization review function as the basis for their claims. The Martins contend Bright failed to properly investigate the request for a cerebral angiogram and coil embolization at USC. They also contend Bright failed to properly train its physicians and staff regarding PacifiCare's standards and procedures for conducting utilization review. The Martins' reply brief candidly acknowledges that the basis for the Martins' claims is that "Bright was not following PacifiCare's standards and procedures when it conducted the delegated U[tilization] R[eview] function." By relying on Bright's conduct to establish their claim against PacifiCare, the Martins base their claims on vicarious, not direct, liability.

The Martins nonetheless contend their claims are based on direct liability because "PacifiCare should have identified and remedied these glaring problems in Bright's claims-handling process." According to the Martins, federal Medicare regulations required PacifiCare to continuously monitor Bright's compliance with PacifiCare's standards for timely access to medical care. (See 42 C.F.R. § 422.112(a)(6)(i) (2010).) But the Martins do not point to any evidence showing PacifiCare failed to properly monitor Bright, nor do they provide any authority or explanation regarding what sort of monitoring this regulation required. Similarly, the Martins point to no evidence or authority showing that proper monitoring would have uncovered Bright's alleged failure to follow PacifiCare's standards and procedures.

The Martins' complaint sought to hold PacifiCare directly liable for how it designed and implemented the standards and procedures it required Bright to use in performing the utilization review function. At trial, however, the court found the Martins failed to present sufficient evidence to support this direct liability theory and, on appeal, the Martins do not argue PacifiCare's standards and procedures were deficient in any respect. Although the conclusory assertion that PacifiCare should have discovered the "glaring problems in Bright's claims-handling process" may state a claim at the pleading stage, it is not sufficient to avoid nonsuit at trial.

Moreover, the Martins did not make their direct liability argument in the trial court. Neither their written nor oral opposition to the nonsuit motion asserted section 1371.25 did not apply because the Martins based their claims on PacifiCare's direct liability. After hearing the Martins' case at trial, the trial judge recognized the Martins based their claims on a vicarious liability theory, not a direct liability theory. Indeed, in explaining to the jury that *Watanabe* and section 1371.25 required him to grant PacifiCare's nonsuit motion, the trial judge stated "the whole theory of this case was that, as you

know, and you've heard it again and again throughout this case, that Bright was the agent of PacifiCare." The Martins did not dispute this characterization of their claims.

" 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant. [Citation.]' [Citations.]" (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

The record shows the Martins tried their claims against PacifiCare on a vicarious liability theory rather than a direct liability theory. The Martins cannot change their liability theory on appeal. Even if they could, the Martins failed to point to sufficient evidence and authority to establish a direct liability theory.

D. *The Medicare Act Does Not Preempt Section 1371.25*

On appeal, the Martins contend for the first time that section 1371.25 does not bar their claims because federal law preempts that statute. Specifically, the Martins contend federal law regarding the Medicare Advantage program preempts section 1371.25 if the current version of the Medicare Act's (Pub.L. No. 89-97 (July 30, 1965) 79 Stat. 291) express preemption provision applies in this case. The Martins, however, defeat their own preemption challenge by conceding (1) the Medicare Act does not preempt section 1371.25 if the preemption provision's *prior* version applies and (2) the prior version applies in this action.

The Martins raise this preemption challenge as a fallback position. Both sides presented extensive briefing on whether the Medicare Act preempts the Martins' causes of action, and which preemption provision applies in this case. The Martins simply assert the Medicare Act preempts section 1371.25 in case we reject their argument and conclude the preemption provision's current version applies. Because we conclude section 1371.25 bars the Martins' claims, we do not reach the question whether the Medicare Act preempts the Martins' claims.[11] Nonetheless, we must briefly address the Martins' contention that the current version of the Medicare Act preempts section 1371.25.

---

[11] We deny PacifiCare's request to judicially notice an order and brief from *Uhm v. Humana, Inc.*, United States Court of Appeals, Ninth Circuit, case No. 06-35672. Those documents relate to whether the Medicare Act preempts the Martins' state law claims. Because we do not reach that issue, those documents are irrelevant and we deny the request on that ground. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276 [63 Cal.Rptr.3d 418, 163 P.3d 106].)

We agree with the Martins that the preemption provision's prior version applies in this case. Amendments to the Medicare Act's preemption provision apply prospectively only. (*Zolezzi v. PacifiCare of California* (2003) 105 Cal.App.4th 573, 587–588 [129 Cal.Rptr.2d 526]; *Pagarigan v. Superior Court* (2002) 102 Cal.App.4th 1121, 1149–1150 [126 Cal.Rptr.2d 124].) The date the operative act or omission occurred is the date for determining which preemption provision applies. (*Zolezzi*, at p. 588.) *Zolezzi* addressed whether the Medicare Act preempted a California statute regulating arbitration agreements in health care service plans. The *Zolezzi* court concluded the earlier version applied because it was in effect when the plaintiff enrolled in the plan and when the events giving rise to the action occurred. (*Zolezzi*, at p. 588.)

Here, Congress enacted the current version of the Medicare Act's preemption provision on December 8, 2003. (*Caraco Pharmaceutical Laboratories, Ltd. v. Forest Laboratories, Inc.* (Fed.Cir. 2008) 527 F.3d 1278, 1283, fn. 2; Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub.L. No. 108-173 (Dec. 8, 2003) 117 Stat. 2066, 2208).) All acts and omissions giving rise to the Martins' claims occurred before that date, including Bright's denial of the initial request for an angiogram and coil embolization at USC, its refusal to reconsider that denial, its failure to respond to Giannotta's fax explaining the need for an angiogram at USC rather than Presbyterian Intercommunity Hospital, and the unnecessary angiogram at Presbyterian Intercommunity Hospital. Bright's acts that occurred after Congress enacted the preemption provision's current version consisted of prompt approvals of a consultation, angiogram, and coil embolization with Teitelbaum and Larsen at USC. Elsie died after Congress enacted the current version, but the Martins claim she died due to the delays Bright caused before Congress amended the preemption provision. Consequently, we agree with the Martins that the prior version applies.

Because they concede the prior version does not preempt section 1371.25, the Martins provide no argument or authority explaining how that version could preempt section 1371.25. By failing to provide any authority to support that contention, the Martins waived it. The Medicare Act does not preempt section 1371.25 in this case.[12] (*Robinzine v. Vicory* (2006) 143 Cal.App.4th

---

[12] We do not address whether the Medicare Act preempts any other statute included in California's Knox-Keene Act. The Martins do not argue the Medicare Act preempts any specific statute other than section 1371.25. They include conclusory statements in their reply brief that the Knox-Keene Act provisions are preempted, but they fail to identify which provisions they claim are preempted and these conclusory statements are therefore not sufficient to preserve the issue on appeal. (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1216 [45 Cal.Rptr.3d 265] [party waived arguments by raising them for the first time in the reply brief]; *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 51–52 [115 Cal.Rptr.2d 151] [failure to apply a heading to an appellate argument results in a waiver of that argument].)

1416, 1422, fn. 6 [50 Cal.Rptr.3d 65] [argument waived on appeal "by failing to provide this court with relevant authority or argument"].)

## III

### DISPOSITION

The judgment is affirmed. PacifiCare shall recover its costs on appeal.

Fybel, J., and Ikola, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 16, 2011, S197089.