Filed 4/22/14  Rahm v. Kaiser Foundation Health Plan CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ANNA RAHM, | B247282 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC441742) |
| v. | |
| KAISER FOUNDATION HEALTH PLAN, INC., | |
| Defendant and Respondent. | |

_____

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dunn, Judge.  Affirmed.

Schernoff Bidart Echeverria Bentley, Michael J. Bidart, Ricardo Echeverria and Danica Dougherty; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich, for Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner and S. Thomas Dodd; Taylor Blessy, N. Denise Taylor, Julianne M, Demarco and Jennifer Scher, for Defendant and Respondent

_____

Anna Rahm filed a bad faith insurance action alleging Kaiser Foundation Health Plan provided improper economic incentives that induced her health care provider to deny a magnetic resonance imaging test (MRI). Rahm further alleged the Plan did not adequately inform her of right to appeal the denial of the MRI and violated Health and Safety Code section 1367 by failing to provide medically necessary care in a timely manner. The Plan filed a motion for summary judgment; the trial court granted the motion and entered judgment in favor of the Plan. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Summary of Facts Preceding Rahm's Lawsuit*[1]

Plaintiff Anna Rahm was enrolled in a health care plan administered by Kaiser Foundation Health Plan (the Plan). In August of 2008, Rahm, then sixteen years old, began experiencing mild back pain. Over the next several months, the pain became more severe. On March 12, 2009, Rahm visited her primary care physician, Charlene Huang, who was employed by the Southern California Permanente Medical Group (the Medical Group). Rahm's mother, Lynnette Rahm, informed Huang that Rahm's chiropractor believed an MRI was necessary. Huang told Lynnette and Rahm that although she agreed an MRI was necessary, she lacked the authority to authorize the procedure. Huang prescribed a steroid medication and referred Rahm to the Medical Group's physical medicine department, explaining that the physical medicine department had authority to request MRIs. Huang's notes of the meeting failed to mention that Rahm and Lynnette had requested an MRI.

On March 24, 2009, Rahm and Lynnette met with Ngan Vuong, a physician in the Medical Group's physical medicine department. Rahm told Vuong she was suffering from severe, unremitting lower back pain that made it difficult for her to sleep. Rahm also stated she had tried numerous forms of treatment and all of them failed to alleviate her pain. Lynnette informed Vuong they had been referred to the physical medicine

---

[1] This factual summary is predicated on evidence Rahm filed in opposition to the Plan's motion for summary judgment.

department to obtain authorization for an MRI. Vuong, however, stated she would not authorize an MRI unless Rahm was undergoing back surgery. Vuong recommended Rahm treat her back with heat and ice packs, pain medication and physical therapy. She also recommended Rahm start exercising more frequently and improve her diet. Vuong's notes of the meeting failed to indicate that Rahm or Lynnette had requested an MRI.

On May 7, 2009, Lynnette called Vuong and renewed her request for an MRI. Lynnette told Vuong that Rahm's pain level had increased and that she had begun experiencing numbness in her foot. Vuong, however, denied the request for the MRI and referred Rahm to physical therapy. Rahm attended physical therapy until she found the sessions too painful to continue. Rahm's physical therapist told Lynnette she agreed an MRI was necessary to determine the cause of Rahm's pain.

In June of 2009, Lynnette called Vuong again to request an MRI. Vuong denied the request and told Lynnette she could get a second opinion if she did not like what she was being told. On June 16, 2009, Lynnette contacted Huang and reported that Vuong had repeatedly refused to order an MRI. Huang immediately approved an MRI.

Rahm received an MRI on July 2, 2009. Four days after the procedure, Huang reported the MRI showed a growth on Rahm's pelvis. Subsequent testing revealed Rahm had an aggressive form of bone cancer that resulted in the amputation of her right leg and a portion of her pelvis.

### B. Rahm's Complaint

On July 15, 2010, Rahm filed a complaint against the Plan and the Medical Group alleging claims for breach of the implied covenant of good faith and fair dealing and breach of contract.[2] Rahm asserted the defendants, who she collectively referred to as "Kaiser," had devised "a system of withholding benefits from insureds which necessarily results in [Kaiser] unreasonably depriving its insureds the benefits of their contacts with [Kaiser]. This system is one where [Kaiser] has bestowed upon its contracted physicians

---

[2] The complaint listed additional parties and asserted additional claims that have no relevance to the issues in this appeal.

3

the responsibility of determining whether or not to give insureds benefits under their contracts.  Underlying this system is a cost saving component:  each determination a [Kaiser] physician makes must be based, in part, upon the cost to [Kaiser] of the treatment or care requested.  [¶] . . . .  [T]his system, with a heavy emphasis on cost saving to [Kaiser], results in pressures on [Kaiser's] physicians that removes (*sic*) the physicians' abilities to give medical care which is in the patient's best interests.  This system also results in little or no investigation by [Kaiser] as to whether a patient is in need of certain medical care and/or treatment.  This system is concealed from [Kaiser's] insureds and ultimately causes them harm."

The complaint further alleged "[Kaiser's] physicians are rewarded for adhering to the cost saving system that [Kaiser] has put into place.  Specifically, that the physicians receive bonuses which are dependent upon the cost savings realized by [Kaiser] due to the physicians withholding of treatment and or care of the insureds."

Rahm alleged defendants had "breached their duty of good faith and fair dealing" by, among other things:  (1) "unreasonably denying and delaying care and treatment to [Rahm] that was covered under [the plan]"; (2) "unreasonably avoiding incurring expenses for diagnostic testing . . . for its own financial gain by ignoring the seriousness of [Rahm's] medical condition and needs"; (3) "placing its own financial interests ahead of [Rahm's] health care"; and (4) "unreasonably  engaging in a pattern and practice of failing to conduct a thorough, fair and balanced investigation in evaluating requests for benefits and/or services for its members under [the plan]."

Rahm's breach of contract claim contained similar allegations, asserting defendants had withheld or delayed "coverage for care and diagnostic testing . . . that was covered under the Evidence of Coverage" and placing their "own financial interests ahead of [Rahm's] health care."

4

### C. Defendants' Motion for Summary Judgment

#### 1. Defendants' motion and supporting evidence

##### a. Summary of defendants' motion

On May 9, 2012, the Plan and the Medical Group filed a motion for summary judgment, or, in the alternative, summary adjudication. The Plan argued that, under Health and Safety Code section 1371.25,[3] a health plan could not be held vicariously liable for improper medical decisions made by a care provider. The Plan contended the parties' undisputed evidence showed: (1) Huang and Vuong were solely responsible for denying Rahm's requests for an MRI; (2) the Plan had no influence over the Medical Group's treatment decisions; (3) the Plan was unaware the Medical Group had refused to authorize an MRI; and (4) Rahm never contacted the Plan to complain about the denial of the MRI. According to the Plan, this evidence demonstrated it could not "be held liable for insurance bad faith" because it "did not directly commit any act or omission contributing to delaying [Rahm's] MRI." The Plan raised essentially identical arguments regarding Rahm's breach of contract claim, asserting that "[b]ecause [the Plan] did not directly commit any act or omissions contributing to delay in [Rahm's] MRI, [it could] not be held liable for breach of contract, any more than it [could] be held liable for insurance bad faith."

The Medical Group, on the other hand, argued it was entitled to judgment on both of Rahm's claims because: (1) only an insurer or health care service plan could be held liable for insurance bad faith; and (2) Rahm's allegations against Huang and Vuong sounded in tort, thereby precluding a claim against the Medical Group for breach of contract.

##### b. Summary of supporting evidence

In support of the motion, the Plan and the Medical Group provided declarations describing their relationship. George Di Salvo, the chief finance officer for the Plan's Southern California Region, provided a declaration explaining the Plan was "licensed and

---

[3] Unless otherwise noted, all further statutory citations are to the Health and Safety Code.

regulated in California as a health care service plan . . . pursuant to the California's Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.)."[4] In its role as a health care plan, the Plan did not directly provide medical care to its subscribers. Instead, it contracted with the Medical Group "to provide and arrange for certain professional services under [the Plan] members' membership agreements . . . ."

Di Salvo also explained the Plan and the Medical Group were separate entities who "negotiate[d] at arms length for the [Medical Group's] services. In turn, [the Medical Group] provides services to [Plan] members." According to Di Salvo, the Medical Group had sole authority "as to how to use the funds paid by [the Plan] and to manage its operations and set physician salaries." The Plan did not "influence, direct or manage the services rendered by [the Medical Group]," and it did not "dictate individual physician medical decisions for individual patients." The Plan also did not place any "limitations or restrictions on [the Medical Group's] physicians' ability to order diagnostic testing, including MRIs" or provide "any incentives, bonuses or other financial compensation . . . to . . . physicians for withholding medically necessary care to [Plan] members."

Jeffrey Selevan, a senior advisor at the Medical Group, provided a similar declaration. Selevan explained the Medical Group was a licensed medical care provider (see § 1345, subd. (i)[5]) that contracted with the Plan to "provide outpatient and inpatient professional medical services to [the Plan] in the Southern California area." Selevan further explained the Plan and the Medical Group were wholly separate entities whose relationship was "strictly contractual." Under their operating contracts, the Plan was

---

**4** The Knox-Keene Act defines a health care service plan as: "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (§ 1345, subd. (f)(1).)

**5** Section 1345, subdivision (i) of the Knox-Keene Act defines "providers" as "any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services."

6

required to pay the Medical Group a pre-negotiated "amount per member"; the Medical Group, in turn, was "solely responsible" for providing patient care and determining how to spend its funds.

Selevan also explained the Medical Group retained sole authority to hire, supervise, discipline and compensate its physicians. According to Selevan, a substantial majority of physicians' salaries were based on "direct work"; the "remaining percentages of their income [were] considered at risk and depend[ed] on quality, service, access and the financial performance of the medical group." No portion of "[p]hysician compensation . . . [was] tied to utilization of [MRIs]" and "[a]ll physicians [we]re free to order MRIs for their patients based on their clinical judgment." Under the Medical Group's governing provisions, physicians were required to base their medical decisions on "national and internationally recognized standards." Selevan was unaware of "any financial incentives regarding physician compensation which [wa]s directly tied to denying needed treatment or care."

Defendants also provided a declaration from Lorrie Lewis, who oversaw the Plan's processing of subscriber complaints and grievances. Lewis stated she had reviewed Rahm's file and found "no evidence that [Rahm] or anyone on her behalf called to request that an MRI be . . . authorized by [the Plan] at any time in 2009." Lewis further stated there was no evidence the Plan had received a "complaint" from Rahm or anyone acting on her behalf regarding "any alleged denial or delay of medical care or service."

Rahm's treating physicians, Huang and Vuong provided declarations stating their "decisions related to the care and treatment for Anna Rahm, including ordering an MRI, were based on [their] clinical judgment." Both physicians also stated they had never been told they lacked authority to order an MRI, or that they would be rewarded for denying an MRI.

Finally, defendants provided a declaration from Alain Enthoven, an expert in health policy and management who had reviewed Rahm's medical files, the deposition testimony of several witnesses and numerous documents governing the relationship

7

between the Plan and the Medical Group. Enthoven concluded the documents he had reviewed contained no evidence the Plan played any role in deciding "whether or when to order an MRI for [Rahm]" or that Rahm had ever "contacted [the Plan] directly to request an MRI." Enthoven further concluded the documents showed "physicians' compensation methodology was not tied to MRI utilization or cost." According to Enthoven, Huang and Vuong's deposition testimony made clear "they could order an MRI without seeking pre-approval or pre-authorization from [the Plan]."[6]

### 2. *Rahm's opposition and supporting evidence*

#### a. *Summary of Rahm's opposition*

Rahm's opposition conceded that, under section 1731.25, the Plan could not be held vicariously liable for the Medical Group's treatment decisions. She argued, however, there were three ways in which a jury could find the Plan was "directly liable for its own tortious conduct" that had contributed to the delays in authorizing her MRI.

First, Rahm contended there were triable issues of fact whether the "[P]lan's structure and emphasis on cost control induced [her] physicians to withhold an MRI." Rahm explained the defendants' documents showed the Plan paid the Medical Group a pre-negotiated, "'capitat[ed]'" amount for each Plan subscriber on a monthly basis. The Medical Group used the funds to pay for the subscribers' medical care costs, including physician salaries. If the Medical Group received more from the Plan than it expended on the subscribers' health care, it was permitted to distribute a portion of the excess funds to its physicians as a form of "extra compensation." Rahm contended that, based on this evidence, a jury could infer the Plan's compensation scheme had incentivized Huang and Vuong to deny her an MRI based on economic considerations, rather than medical ones. According to Rahm, this theory was supported by evidence indicating there was no medical justification for denying her MRI.

---

**6** In addition to these six declarations, the defendants submitted numerous documents in support of their motion, including a copy of Rahm's Evidence of Coverage, the Plan's master service agreement with the Medical Group, Rahm's medical records and excerpts from the depositions of several witnesses.

8

Under her second theory of liability, Rahm argued a jury could find the Plan had acted in bad faith by failing to advise her she could appeal the Medical Group's denial of the MRI. Although Rahm conceded her policy included instructions on how to appeal a denial of services, she asserted the California Supreme Court's decisions in *Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1 (*Sarchett*) and *Davis v. Blue Cross Northern California* (1976) 25 Cal.3d 418 (*Davis*) required health plans to ensure their members understood the review rights set forth in their policies. Rahm contended this rule imposed a duty on health plans to train their providers to advise patients of their right to appeal any denial of service. Rahm argued there was no evidence the Plan had provided any such training to the Medical Group or that her physicians had ever advised of her right to appeal the denial of the MRI.

Finally, Rahm argued a jury could find the Plan had breached section 1367, subdivision (e)(1)'s requirement that health plans "provide or arrange for the provision of covered health care services in a timely manner." Rahm contended a "jury could conclude that [the Medical Group's] four denials of an MRI . . . between March 12 and June 16, 2009 constitute[d] a violation of the Plan's regulatory obligations to ensure that its members received the care they need in a timely manner appropriate for their condition."

Rahm asserted all these arguments applied equally to her contract claim against the Plan. She did not oppose dismissal of her claims against the Medical Group.

### b. *Summary of supporting evidence*

In support of her opposition, Rahm filed an expert declaration from Early Brien, the director of the Musculoskeletal Tumor Service at Cedars Sinai Medical Center. Brien reviewed Rahm's medical records and concluded an "MRI . . . was medically necessary by March 24, 2009," and that there was no "medical reason for a physician treating her not to order an MRI . . . on or after [that date]." Brien also stated that, based on his experiences with "medical-billing issues," he was aware "MRIs are generally substantially more expensive than . . . other imaging techniques. As a result, the parties

9

who are often required to pay for the MRIs often have taken measures to restrict the use of MRIs."

Rahm also provided a declaration from her mother Lynnette summarizing their meetings with Huang and Vuong. Lynnette confirmed she had requested Huang or Vuong authorize an MRI during meetings in March, May and June of 2009. On each occasion, Huang or Vuong had denied the request.

Rahm also filed several documents the Plan and the Medical Group had produced during discovery. The documents included an excerpt "from Kaiser Permanent's website" explaining how the Medical Group's physicians were compensated: "Our doctors are compensated as a result of a two-step process: (1) Health Plan pays the Medical Group; and (2) the Medical Group pays the doctors . . . . Each year . . . the Health Plan and Medical Group in each region negotiate and agree on the total amount of money that is estimated will enable [Medical Group] physicians . . . to provide the amount of professional medical care that our members are expected to need in the upcoming year . . . . [¶] That total is divided by 12 months, and then divided by the number of expected members that year. That calculation results in an amount of money (the 'capitation') that the Health Plan pays the Medical Group on a monthly basis for each member." The document further explained that if the "captitation" amount the Medical Group receives is "greater than the actual cost of the necessary medical care, then the Medical Group, as a whole, is permitted to share in some of the surplus . . .," including "additional compensation to doctors and other personnel."

The documents also included a power point presentation the Medical Group had shown its physicians during an annual training program called "SCPMG University." The power point slides stated that the medical services agreement negotiated between the Plan and the Medical Group provided "financial alignment" between the two entities. The slides also indicated "affordability [wa]s the keystone to growth" because low plan rates "attract[ed] new members." A slide entitled "Summing it Up" contained bulleted text stating: "Growth is critical"; "Affordability drives growth"; "Physicians can control up to 80% of program expenses – **HUGE** role in the affordability challenge"; "Our

10

futures depend on our ability to provide affordable, quality, and convenient healthcare to our members."**7**

### 3. *The Plan's reply brief*

In its reply brief, the Plan argued all three of Rahm's "direct liability" theories failed as a matter of law. First, it asserted Rahm's own evidence showed the Plan's compensation arrangement with the Medical Group was a standard "capitation" agreement specifically permitted under section 1348.6, subdivision (b). According to the Plan, it could not be held liable for engaging in a form of conduct the Legislature had sanctioned.

Second, the Plan argued Rahm had failed to identify any authority suggesting the rule set forth in *Sarchett, supra,* 43 Cal.3d 1 and *Davis, supra,* 25 Cal.3d 418, compelled health plans to advise their providers that patients should be informed of their right to appeal the denial of any medical service. According to the Plan, *Sarchett* and *Davis* merely held that when a health plan informs a subscriber it is denying coverage of a service, it must inform the subscriber of his or her right to appeal the decision. The Plan argued that, in this case, Rahm had not identified any evidence the Plan was even aware the Medical Group had denied the MRI. The Plan also argued Rahm had presented no evidence demonstrating it had failed to train the Medical Group physicians to advise patients of their right to appeal a denial of coverage.

Third, the Plan argued the obligations set forth in section 1367, subdivision (e)(1) did not require it to ensure the Medical Group approved all medically necessary care in a timely manner. According to the Plan, the statute only required health plans to ensure their providers had the capability to deliver approved services in a timely manner. The Plan argued the evidence showed that, in this case, the statute was not violated because Rahm received her MRI shortly after Huang had approved it.

---

**7**      Rahm submitted numerous additional documents in support of her opposition, including excerpts from several witness depositions, a copy of her Evidence of Coverage and other administrative materials from the Plan and the Medical Group.

11

### D. The Trial Court's Ruling

At the motion hearing, the trial court described Rahm's primary theory of liability – that "the Plan's . . . focus on cost containment induced [Rahm's] doctors to withhold an M.R.I." – as "an overall critique of the H.M.O. structure for Kaiser." The court questioned whether this theory was viable given that section 1348.6 specifically permitted "capitation" agreements between health plans and their providers. The court also stated Rahm's other two theories of liability sought to impose obligations on health plans that were "better decided at the Legislative level, rather than the trial court level."

Following the hearing, the court issued an order granting the Plan and the Medical Group's motions for summary judgment. According to the court, the parties' undisputed evidence demonstrated that: (1) the Plan "does not dictate [the Medical Group] doctors' medical decisions – the doctors themselves decide virtually all aspects of how medical care is delivered to [Plan] members, including whether to order an MRI"; (2) "[the Plan] does not place any limitations or restrictions on doctors' ability to order diagnostic tests like MRIs"; (3) "there is no evidence [Rahm or anyone acting on her behalf] ever contacted [the Plan] about an MRI"; and (4) "[t]here is no evidence of any specific incentive or disincentive for [Medical Group] doctors with regard to MRIs – no bonus or other compensation for not ordering MRIs."

The court concluded that, under these undisputed facts, all of Rahm's "direct liability" theories failed. First, the court explained Rahm had failed to demonstrate a jury could find the Plan's "structure and emphasis on control induced [Medical Group] doctors to withhold a medically necessary MRI." The court concluded section 1348.6, subdivision (b) specifically sanctioned the financial "structure" utilized by the Plan: "The Legislature . . . has spoken on which types of financial incentives for doctors to control costs are acceptable and which are not. . . . [Under section 1348.6], [t]he overall cost control incentives that [Rahm] complain[s] about fall into the acceptable category, in contrast to specific incentives to deny or limit specific medical services, which fall into the unacceptable category."

12

The court also rejected Rahm's theory a jury could find the Plan acted in bad faith by failing to "train [Medical Group] doctors to inform their patients that they can seek a review from [the Plan] of a denied request for an MRI." The court explained Rahm had failed to provide any evidence her "doctors lacked such training." The court also explained *Sarchett, supra*, 43 Cal.3d 1, merely required a health plan to provide its insureds with certain information when it denied a request for coverage; it did not impose a duty on health plans to train their providers' physicians to inform patients of their contractual rights. According to the court, *Sarchett* had no applicability where, as "here, . . . the plan] knew nothing about [Rahm and her] circumstances, so it did not and could not have denied coverage."

Finally, the court rejected Rahm's theory the Plan violated its "regulatory obligations" by failing to ensure she was "provided with a timely [MRI]." The court explained that the statute and regulation Rahm had relied on – section 1367, subdivision (e)(1) and 28 CCR section 1300.67.2.2 – required only that the Plan ensure Rahm had "timely access to MRI's once they [were] ordered." It further ruled the Plan's evidence showed it had "met this requirement" by performing the MRI within 15 days of when Huang had authorized it. (See 28 CCR § 1300.67.2.2, subd. (C)(5)(F) ["Non-urgent appointments for ancillary services for the diagnosis or treatment of injury" should be scheduled "within 15 days of the appointment"].)

The order explained that because Rahm had failed to identify any valid theory of "direct liability," the Plan was entitled to judgment on her claims for breach of contract and breach of the covenant of good faith. The order also explained the Medical Group was entitled to judgment on each of those claims because Rahm had not opposed their dismissal.

13

After entering its order, the court permitted Rahm to amend her complaint to add a medical malpractice claim against the Medical Group.  The court then entered a judgment dismissing the Plan from the action.  Rahm filed a timely appeal of the judgment.[8]

## DISCUSSION

### A.  Standard of Review

On appeal, Rahm argues the trial court erred in granting judgment on her claim for breach of the implied covenant of good faith and fair dealing.[9]  ""''The standard for deciding a summary judgment motion is well-established, as is the standard of review on appeal." [Citation.]  "A defendant moving for summary judgment has the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established, or that there is a complete defense to that cause of action.  [Citation.]  The burden then shifts to the plaintiff to produce specific facts showing a triable issue as to the cause of action or the defense.  [Citations.]  Despite the shifting burdens of production, the defendant, as the moving party, always bears the ultimate burden of persuasion as to whether summary judgment is warranted.  [Citations.]" [Citation.]' [Citation.]" (*Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1443 (*Multani*.)

---

[8]     Because the trial court's judgment left no issues to be determined between Rahm and the Plan, the judgment is appealable even though Rahm's action continued against the Medical Group.  (See *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 821, fn. 3*; Hazel v. Hewlett* (1988) 201 Cal.App.3d 1458, 1463, fn. 3.)

[9]     Rahm has presented no argument regarding the other three claims the court dismissed in its order and judgment, which included breach of contract, negligent infliction of emotional distress and intentional infliction of emotional distress.  We therefore treat these claims as abandoned. (See *Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177 ["failure to address summary adjudication of a claim on appeal constitutes abandonment of that claim"]*; Los Angeles Equestrian Center, Inc. v. City of Los Angeles* (1993) 17 Cal.App.4th 432, 450 [summary resolution of causes of action not addressed in appellants' brief upheld because the "failure to discuss the theories on appeal constitutes an abandonment"].)

14

"""On appeal, we review de novo an order granting summary judgment. [Citation.] The trial court must grant a summary judgment motion when the evidence shows that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citations.] In making this determination, courts view the evidence, including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party. [Citations.]" [Citation.]' [Citation.]" (*Multani, supra,* 215 Cal.App.4th at pp. 1443-1444.) "'The same standards apply to motions for summary adjudication.' [Citation.]" (*Id*. at p. 1444.)

## B. Summary of Knox-Keene Act's Prohibition on Vicarious Liability

As summarized above, it is undisputed the Plan is a licensed "health care service plan" that contracts with other entities to deliver medical care to subscribers who enroll in its plans. (See § 1345, subd. (f)(1) [defining health care service plan]; *Kaiser Foundation Health Plan, Inc. v. Superior Court* (2012) 203 Cal.App.4th 696, 708 (*Kaiser*) [describing the Plan as health care service plan][10].) It is also undisputed the Medical Group is a "health care provider" that contracts with the Plan to provide medical services to the Plan's members. (See § 1345, subd. (i) [defining providers]; *Kaiser, supra,* 203 Cal.App.4th at p. 708.)

Section 1371.25 states that health plans and providers may only be held liable for their own acts or omissions: "A plan . . . and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others. Any provision to the contrary in a contract with providers is void and unenforceable." Several courts (including this Division) have concluded section 1371.25 "'prevent[s] a health care service plan from being held vicariously liable for a medical provider's'" treatment decisions. (*Kaiser, supra,* 203 Cal.App.4th at p. 714.)

---

**10** In *Kaiser, supra*, 203 Cal.App.4th 696, we denied a writ petition from the Plan arguing that Rahm's punitive damages allegations should be stricken pursuant to Code of Civil Procedure section 425.13. In a published decision, we concluded "the procedural requirements [set forth in section 425.13] do not apply to claims against health care service plans." (*Kaiser, supra*, 203 Cal.App.4th at p. 715.)

15

For example, in *Watanabe v. California Physicians' Service* (2009) 169 Cal.App.4th 56 (*Watanabe*), the plaintiff sued a plan based on a provider's delay in authorizing a medical procedure. Under the plan's contract with the provider, the provider was responsible for "utilization review" (*id.* at p. 60), which is the "process physicians use to determine whether a particular service or treatment is medically necessary and therefore covered by the applicable health care service plan." (*Martin v. PacifiCare of California,* (2011) 198 Cal.App.4th 1390, 1395 (*Martin*); see also *Watanabe, supra,* 169 Cal.App.4th at p. 60 [describing utilization review as "the initial determination whether a particular service or treatment was medically necessary"].) Although the plan retained authority to review and reverse the provider's decision, the review process was "triggered" only when a subscriber appealed the provider's treatment decision to the plan. (*Id.* at p. 60.) The plaintiff's claim, however, was predicated on a provider's utilization review decision that had never been appealed to the plan. The court concluded the claim was barred because, under section 1371.25, the plan could not be held "vicariously liable" for the provider's treatment decision. (*Id.* at p. 64.)

The court reached a similar holding in *Martin, supra,* 198 Cal.App.4th 1390. As in *Watanabe*, the defendant in *Martin* was a health plan that had delegated the utilization review function to a provider, but "retained final authority to override [the provider's] decisions, assuming the subscriber appealed or otherwise brought the issue to [the plan's] attention." (*Id.* at p. 1401.) The plaintiff filed a bad faith claim against the Plan alleging it was liable for the provider's "delays in approving" various medical procedures. (*Id.* at p. 1398.) The plan moved for summary judgment, arguing the claim was precluded under section 1371.25 "because [the plan's provider] made all utilization review decisions regarding [plaintiff's] medical care and neither [plaintiff] nor anyone acting on her behalf brought the matter to [the plan's] attention." (*Id.* at p. 1398.) Although the trial court initially denied defendant's motion, it granted a motion for nonsuit following the publication of *Watanabe, supra,* 169 Cal.App.4th 56.

On appeal, the plaintiff argued *Watanabe* had erred in concluding section 1371.25 "preclude[d] holding a health care service plan vicariously liable for a medical provider's

16

acts or omissions." (*Martin, supra,* 198 Cal.App.4th at p. 1390.)  Plaintiff contended *Watanabe* had failed to consider legislative history demonstrating section 1371.25 was only intended "to bar a health care service plan from requiring a medical care provider to indemnify it." (*Id.* at p. 1402.)  The court rejected the argument, explaining that plaintiff's legislative history pertained to an early draft of the statute that the Legislature never adopted.  According to the court, subsequent legislative materials showed that although the statute "began as a measure to prevent health care service plans from requiring medical providers to hold them harmless for the plans' own acts or omissions[,]" it was "ultimately broadened . . . to bar actions seeking to hold plans and providers vicariously liable for one another's acts or omissions." (*Id.* at p. 1404.)  Based on this history, *Martin* agreed with *Watanabe's* interpretation of section 1371.25 and concluded the statute "prevent[ed] [plaintiff] from holding the plan vicariously liable for the [provider's] acts or omissions. (*Ibid.*)

### C. *The Trial Court Did Not Err in Granting the Plan's Motion for Summary Judgment*

Rahm's claim against the Plan is factually analogous to the claims addressed in *Watanabe* and *Martin*.  As in those cases, Rahm alleges a bad faith claim against the Plan that is predicated on the Medical Group's delay in authorizing medical services.  Like the defendants in *Watanabe* and *Martin*, the Plan has delegated the utilization review function to the Medical Group, but permits Plan members to appeal denials of service to the Plan.  Finally, as in those cases, there is no evidence Rahm or anyone acting on her behalf ever contacted the Plan to complain about the Medical Group's repeated denials of the MRI, nor is there any evidence the Plan had any knowledge the Medical Group had denied an MRI.

Rahm, however, contends *Watanabe* and *Martin* are inapplicable because she is not seeking to hold the Plan vicariously liable for the Medical Group's delay in authorizing an MRI.  Instead, she is seeking to hold the Plan "directly liable" for various acts it committed that contributed to the delay of her MRI.  As in the trial court, Rahm

17

argues the evidence supports three possible theories of "direct" liability.  First, she contends there are triable issues of fact whether the Plan's capitation agreement with the Medical Group provided economic incentives that induced her physicians to delay the MRI.  Second, she asserts the evidence shows the Plan contributed to the delay by failing to instruct the Medical Group to advise subscribers of their right to seek review of any denial of service.  Third, she contends a jury could find the Plan was liable for the delay because it violated its regulatory obligations under section 1367, subdivision (e).

### a.  The Knox-Keene Act specifically permits the use of capitation agreements between health plans and providers

Rahm first asserts that, based on the evidence in the record, a jury could reasonably infer the Plan "created an environment that caused [her] physicians to deny an MRI because of economic considerations, not medical ones."  Rahm argues the jury could reach this conclusion based on evidence showing that: (1) Huang and Vuong had no medical justification for denying authorization of the MRI; and (2) the Plan's payment agreement with the Medical Group created incentives for the Medical Group's physicians to deny necessary medical services for economic reasons.

Rahm does not dispute that, under this theory of liability, the only "act" attributable to the Plan (and therefore the only act for which the Plan can be held liable) consists of the manner in which it compensated the Medical Group.  The only evidence Rahm has introduced regarding this allegedly improper compensation structure consists of materials from a Kaiser Permanente website explaining how the Medical Group pays its physicians.  The materials state that the Plan pays the Medical Group a pre-negotiated, "capitated" monthly fee for each Plan subscriber.  The Medical Group, in turn, uses these capitation payments to pay the medical care costs of each subscriber, including physician salaries.  The materials also state that if the Medical Group's total expenditures are lower than the capitated amount it receives from the Plan, the Medical Group may distribute a portion of the excess funds to its physicians as a form of bonus compensation.  Rahm essentially asserts that by providing the Medical Group a lump sum payment per

subscriber, the Plan creates financial incentives for the Medical Group to deny more expensive forms of medical care.[11]

As explained by the trial court, this argument fails because the Legislature has specifically endorsed the use of capitation agreements between health care plans and health care providers. Section 1348.6 states, in relevant part: "(a) No contract between a health care service plan and a [provider] shall contain any incentive plan that includes specific payment made directly . . . to a [provider] as an inducement to deny, reduce, limit, or delay specific, medically necessary, and appropriate services provided with respect to a specific enrollee or groups of enrollees with similar medical conditions. (b) Nothing in this section shall be construed to prohibit contracts that contain incentive plans that involve general payments, such as capitation payments, or shared-risk arrangements that are not tied to specific medical decisions involving specific enrollees or groups of enrollees with similar medical conditions."

Section 1348.6 makes clear that although the Legislature has prohibited health plans from using financial incentives that are tied to specific medical decisions or specific enrollees, it has expressly "approved of capitation contracts." (*Desert Healthcare Dist. v. Pacificare FHP* (2001) 94 Cal.App.4th 781, 789 (*Desert Healthcare*)*; California Medical Assn. v. Aetna U.S. Healthcare of California*, *Inc.* (2001) 94 Cal.App.4th 151, 162 ["the Legislature has specifically approved of various risk-shifting arrangements including capitation payments"].) "Capitation" is generally defined as a risk-sharing arrangement in which a plan pays a provider "a set dollar payment per patient per unit of time (usually per month) . . . to cover a specified set of services and administrative costs without regard to the actual number of services provided." (42 C.F.R. § 422.208; see also *Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158, 1163 (*Yarick*)

---

[11] Rahm also asserts the Medical Group's training materials and physician partnership agreements contain language showing that it encouraged its physicians to deny medical services for economic reasons. Rahm, however, has cited no evidence indicating the Plan had any knowledge of these materials, or played any role in preparing them. We therefore fail to see how these materials would support a theory of direct liability against the Plan.

19

[describing capitation agreements]; *California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, 1136 [describing capitation agreements as "risk sharing plan" through which "health care service plans . . . delegate payment responsibility to contracting medical providers"].) Such agreements are "standard in the industry." (*Desert Healthcare, supra,* 94 Cal.App.4th at p. 793.)

The parties' evidence indicates the medical services arrangement between the Plan and the Medical Group is nothing more than a standard capitation agreement. The undisputed evidence shows the Plan and the Medical Group are entirely separate entities that own no interest in one another. Under their agreement, which they negotiated at arms length, the Plan pays the Medical Group a set rate per subscriber on a monthly basis. The agreement contains no financial incentives that are tied to any specific medical service or enrollee. The Plan has no control over the Medical Group's physicians and no influence over their medical decisions or compensation. Rahm has not demonstrated that this arrangement does not qualify as a "capitation" agreement permitted under section 1348.6, subdivision (b). Indeed, although the trial court specifically relied on section 1348.6 in rejecting Rahm's "financial inducement" theory, her appellate briefs do not even reference the statute.[12]

Rahm may be correct that capitation arrangements provide incentives to providers to furnish fewer services to patients, thereby maximizing their own profits. (See *Yarick, supra,* 179 Cal.App.4th at p. 1163 ["it is obvious that . . . a provider receiving capitation payments would, in any given month, make more money if it reduced costs by providing fewer services than the average anticipated by the parties in arriving at a capitation formula"].) The Legislature, however, has specifically sanctioned their use, concluding

---

**12** Rahm's brief does assert the Plan and the Medical Group have a "mutually-exclusive relationship" that increases the likelihood the Medical Group's physicians will be improperly influenced by economic considerations. Liberally construed, Rahm's statement appears to imply that while capitation arrangements are generally permissible, they may be deemed improper where the plan and the provider contract exclusively with one another. Section 1348.6, subdivision (b), however, contains no language indicating capitation agreements are only permissible if the contracting entities also contract with other plans and providers. We decline to read such a limitation into the statute.

20

that the benefits of these financial arrangements outweigh any risks they may present to the public.

Moreover, there are remedies in place to ensure health plans and providers are not improperly influenced by the financial incentives that are an inherent by-product of the capitation system. First, if a provider denies or delays medically necessary services based on its own economic considerations, the patient may pursue a medical malpractice claim against it. As the United States Supreme Court has observed, under the "[managed care] system, a physician's financial interest lies in providing less care, not more. The check on this influence . . . is the professional obligation to provide covered services with a reasonable degree of skill and judgment in the patient's interest." (*Pegram v. Herdrich* (2000) 530 U.S. 211, 219.)

Second, under Civil Code section 3428, health plans owe "a duty of ordinary care to arrange for the provision of medically necessary health care service to its subscribers" and are "liable for any and all harm . . . caused by its failure to exercise that ordinary care." Thus, section 3428 requires that plans act with ordinary care when entering into and negotiating a capitation agreement with a provider. A plan could violate this duty of care by negotiating a capitation rate so low that it would foreseeably cause the provider to deny medically necessary services or deliver below-standard care. Alternatively, a plan could violate this duty of care by entering into a capitation agreement with a provider it knows to be seriously understaffed, poorly administered, or otherwise likely to deny medically necessary services or deliver below-standard levels of care.

In this case, however, Rahm does not claim the Plan violated any duty of care in discharging its duty to arrange the provision of medical services for its members. Instead, she argues the Plan improperly induced the Medical Group to deny medical services by entering into a standard capitation agreement. Because section 1348.6, subdivision (b) specifically sanctions capitation agreements, this claim fails.

21

*b. The Plan did not have a duty to train the Medical Group's physicians to advise Rahm of her contractual rights to appeal the denial of the MRI*

Rahm next contends the jury could find the Plan breached the covenant of good faith by failing "to require the Medical Group's doctors to inform [patients] that they had a right to ask the Plan for assistance if they were unable to obtain services that they believed were covered." Rahm does not dispute she never informed the Plan that Huang or Vuong had denied her requests for an MRI; nor does she dispute the Plan's Evidence of Coverage provided adequate instructions explaining how to appeal a physician's denial of services. She argues, however, that when a health plan delegates utilization review decisions to its provider (see *Watanabe, supra*, 169 Cal.App.4th at pp. 65-66 [identifying various sections of Knox-Keene Act that permit plan to delegate the utilization review function to provider]), the plan must also "train[]" the provider "to advise" plan members they are entitled to appeal the denial of a requested service. The only authorities Rahm cites in support of this purported duty are *Davis, supra,* 25 Cal.3d 418, and *Sarchett, supra,* 43 Cal.3d 1.

Neither of those cases establishes the rule Rahm proposes. In *Davis*, plaintiffs filed a class action challenging their health insurer's systematic refusal to pay certain expenses incurred during hospitalization. After the complaint was filed, the insurer filed a petition asserting the terms of the plaintiffs' policies required arbitration of the underlying disputes. Plaintiffs opposed, arguing the insurer had waived its right to arbitration by (among other things) adopting a "regular practice of rejecting claims submitted by its insureds without notifying them of the availability of an arbitration procedure to which they could resort if they disagreed with the rejection of their claim." (*Id*. at p. 422.) In support, plaintiffs provided copies of the insurer's rejection letters, which stated only that the insurer had "determined . . . the hospitalization expenses . . . . were not covered by the applicable policy and made no mention of any recourse the insured might have under the policy's arbitration clause." (*Id*. at p. 423.) The trial court denied the petition to compel arbitration, concluding the insurer's "failure to inform its insureds of the policy's arbitration provision amounted to an 'implied

22

misrepresentation . . . that such subscribers ha[d] no recourse but to accept the [insurer's] determination [of non-coverage].'" (*Id.* at p. 426.)

The Supreme Court affirmed, explaining "the insurer [had] breached its duty of good faith and fair dealing to its insureds by failing timely or adequately to apprise them of the availability of the arbitration procedure." (*Davis, supra*, 25 Cal.3d at p. 424.) In reaching its holding, the Court rejected the insurer's assertion that the policy's arbitration clause was sufficient to notify the insureds of their rights, and that it had "no additional duty to call such a remedy to [their] attention." (*Id.* at p. 427.) The Court explained this argument "ignore[d] the special nature of the insurer-insured relationship and the resultant duties which an insurer owes to its insureds. [Citations.]" (*Ibid.*) According to the court, these duties required the insurer to "reasonably . . . inform an insured of the insured's rights and obligations under the insurance policy. In particular, in situations in which an insured's lack of knowledge may potentially result in a loss of benefits or a forfeiture of rights, an insurer has been required to bring to the insured's attention relevant information so as to enable the insured to take action to secure rights afforded by the policy." (*Id.* at pp. 427-428.)

The Court emphasized that, in the case before it, the evidence showed the insurer knew "its insureds [were] . . . not . . . aware of the arbitration clause and that, despite this knowledge, [the insurer] deliberately decided not to inform its insureds of the arbitration procedure." (*Davis, supra*, 25 Cal.3d at p. 430.) The Court explained that "[h]aving rejected plaintiffs' claims without so much as calling to their attention their potential remedy of arbitration and having thereby compelled plaintiffs to resort to litigation, [the insurer] is now hardly in a position to reverse itself and to invoke the arbitration process which it left to repose in plaintiffs' dark ignorance." (*Id.* at p. 431.)

In *Sarchett, supra*, 43 Cal.3d 1, the Supreme Court applied *Davis* under a similar set of facts. Plaintiff sued his medical insurer after it denied his claim for hospitalization benefits. The evidence at trial showed that, under the plaintiff's policy, he was entitled to an impartial review and arbitration of any denial of service. The insurer's rejection letters, however, were "couched in terms of finality," stating only that plaintiff's claim

was not covered under the policy and that the insurer was required to "'adhere closely to the terms of the subscriber agreement.'" (*Ibid*.) The trial court found the insurer had violated the covenant of good faith by "repeatedly den[ying] [plaintiff's] claim for hospital benefits without advising him of his contractual right to impartial review and arbitration of the disputed claim." (*Id*. at p. 13.)

The Supreme Court affirmed, concluding that, under *Davis*, the insurer's conduct violated the covenant of good faith and fair dealing. The Court explained that although the policy notified the plaintiff of his contractual right to an impartial review, the evidence showed the insurer "had reason to know [the plaintiff] was uninformed of his rights, since he repeatedly protested the denial without demanding [the] review [provided for under the policy]. [The insurer] nevertheless denied [the plaintiff's] claim several times without mentioning his right to review . . ." (*Sarchett, supra*, 43 Cal.3d at p. 15.) The Court explained that, as in *Davis*, the insurer's "course of conduct appear[ed] designed to mislead subscribers into forfeiting their contractual right to impartial review and arbitration of disputed claims." (*Ibid*.)

In reaching its holding, the Court addressed the dissent's assertion that an insured is normally deemed to be bound by clear and conspicuous terms appearing within the policy: "[It is true that] [w]hen a court is reviewing claims under an insurance policy, it must [generally] hold the insured bound by clear and conspicuous provisions in the policy even if evidence suggests that the insured did not read or understand them. Once it becomes clear to the insurer that its insured disputes its denial of coverage, however, the duty of good faith does not permit the insurer passively to assume that its insured is aware of his rights under the policy. The insurer must instead take affirmative steps to make sure that the insured is informed of his remedial rights." (*Sarchett, supra*, 43 Cal.3d at pp. 15-16.)

Rahm contends that, under the logic of *Davis* and *Sarchett*, a health plan that chooses to delegate utilization review decisions to its provider must takes steps to ensure the provider advises plan members how to appeal the denial of medical care services. We disagree. The holdings in both cases were predicated on the presence of three

24

factors: (1) the insurer was aware the insured disputed the denial of service; (2) the insurer knew or should have known the insured was unaware of the review rights set forth in the policy; (3) despite such knowledge, the insurer did not notify the insured of his contractual right to review. None of those factors are present here. Rahm concedes the Plan had no knowledge that she requested an MRI, that her physicians had denied her request or that she disputed those denials. There is also no evidence the Plan had reason to know Rahm was unaware of the rights of review that were set forth in her Evidence of Coverage.

Nothing in *Davis* or *Sarchett* suggests an insurer who is not aware its insured has been denied a service (or that the insured disputes the denial of the service) must nonetheless take steps to ensure the insured understands the review provisions set forth in his or her insurance policy. Indeed, *Sarchett* clearly suggests just the opposite, explaining that when the insurer is unaware its insured disputes a denial of coverage, courts "must [generally] hold the insured bound by clear and conspicuous provisions in the policy." (*Sarchett, supra*, 43 Cal.3d at p. 15.)

Rahm does not cite any case that has extended *Davis* and *Sarchett* in the manner she proposes. In effect, she requests we announce an entirely new regulatory requirement that health plans train providers who make utilization review decisions to inform patients of their right to appeal a denial of services. Although such a rule might prove beneficial to the public, "[e]stablishing public policy is primarily a legislative function and not a judicial function, especially in an area that is subject to heavy regulation." (*In re Firearm Cases* (2005) 126 Cal.App.4th 959, 986; see also *Desert Healthcare, supra*, 84 Cal.App.4th at p. 796 ["health care finance industry [is a complex] economic arena that courts are ill-equipped to meddle in"].)

> *c. Section 1367, subdivision (e)(1) does not make health plans liable for providers' delay in authorizing medically necessary services*

Finally, Rahm contends the jury could find the Plan acted in bad faith by violating section 1367, subdivision (e)(1)'s requirement that health plans make "[a]ll services . . .

25

readily available at reasonable times to each enrollee consistent with good professional practice." Rahm asserts this provision required the Plan to ensure the Medical Group authorized an MRI as soon as it was medically necessary. The Plan disagrees, contending section 1367, subdivision (e)(1) requires only that health plans ensure their providers are capable of delivering services in a timely manner once those services have been authorized.

Rahm's construction of section 1367, subdivision (e)(1) is in clear conflict with section 1371.25. As explained above, under section 1371.25, a health plan cannot be held vicariously liable for the acts of its provider. Under Rahm's theory, however, a patient could pursue a section 1367 claim against a plan based solely on a provider's failure to provide proper medical care in a timely manner. We cannot conclude that, having precluded the imposition of vicarious liability under section 1371.25, the Legislature intended to re-impose it for a wide range of claims by means of section 1367.

Rahm's argument is also inconsistent with the language of section 1367, subdivision (e)(1) and its implementing regulation. Subdivision (e)(1) requires health plans to ensure "services [are] readily available at reasonable times to each enrollee consistent with good professional practice. To the extent feasible, the plan shall make all services readily accessible to all enrollees consistent with Section 1367.03." Section 1367.03, in turn, directs the Department of Managed Health Care to "adopt regulations to ensure that enrollees have access to needed health care services in a timely manner." The corresponding implementing regulation, 28 CCR section 1300.67.2.2, states that the intent of the regulation is to "confirm[] requirements for plans to provide or arrange for the provision of access to health care services in a timely manner, and establish[] additional metrics for measuring and monitoring the adequacy of a plan's contracted provider network to provide enrollees with timely access to needed health care services." (28 CCR § 1300.67.2.2, subd. (a)(4).)

The regulation directs plans to, among other things, ensure their providers have the capacity to offer enrollees appointments within certain "timeframes." (28 CCR § 1300.67.2.2, subd. (c)(5).) For example, the regulation provides, in part: "Non-urgent

26

appointments for primary care [should be scheduled] within ten business days of the request for appointment" (28 CCR § 1300.67.2.2, subd. (c)(5)(C); "Non-urgent appointments with specialist physicians [should be scheduled] within fifteen business days of the request for appointment . . ."  (28 CCR § 1300.67.2.2, subd. (c)(5)(D); "Non-urgent appointments for ancillary services for the diagnosis or treatment of injury, illness, or other health condition [should be scheduled] within fifteen business days of the request for appointment."  (28 CCR § 1300.67.2.2, subd. (c)(5)(F).)

We find no language in section 1367, subdivision (e)(1), 1367.03 or 28 CCR section 1300.67.2.2 suggesting the Legislature (or the Department of Managed Health Care) intended section 1367 to make health plans liable for a provider's delay in approving certain forms of treatment.  The statutes and implementing regulations make clear these requirements pertain to the timely scheduling of approved services.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


ZELON, J.

We concur:


PERLUSS, P. J.


WOODS, J.

27