Filed 6/6/23 (unmodified opinion and prior 5/17/23 publication order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUSAN FUTTERMAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC.,<br><br>    Defendant and Respondent. | A162323<br><br>(Alameda County Super. Ct. No. RG13697775)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

BY THE COURT[*]:

The petition for rehearing filed by respondent Kaiser Foundation Health Plan, Inc., is denied. The court orders that the opinion filed in this appeal on April 25, 2023 (and ordered to be published on May 17, 2023) be modified as follows:

1. On page 12, in the second paragraph, make the following changes: (1) in the second sentence (which begins with "Kaiser has no written or consistent policy"), insert at the beginning of the sentence the language "According to this evidence, plaintiffs contend,"; and (2) combine that sentence with the next sentence in the paragraph by replacing the period after "vacation" with a comma, and by replacing the language "In addition, Kaiser's

---

[*] Brown, P. J., Streeter, J., Miller, J. (Associate Justice of Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution)

policy" with the language "and its policy" so that the combined sentence reads:

> According to this evidence, plaintiffs contend, Kaiser has no written or consistent policy to ensure that patients receive care when their psychiatrists or therapists are on vacation, and its policy that "any patient that has received any contact with our department in the last two years is not considered a new patient" poses a "barrier to patients receiving timely medically necessary treatment."

2. On page 13, in the first paragraph, in the second sentence (which begins with "Internal Kaiser documents show"), replace that beginning language with "This evidence, according to plaintiffs, includes internal Kaiser documents showing" so that the sentence reads:

> This evidence, according to plaintiffs, includes internal Kaiser documents showing that the Plan's staffing recommendations are inadequate to provide what both the Plan and its medical groups consider necessary for optimal patient outcomes.

3. On page 19, in the second paragraph, in the second sentence (which begins with "As they have argued,"), insert after the first comma the phrase "the evidence permits an inference that" so that the sentence reads:

> As they have argued, the evidence permits an inference that no determination of medical necessity for individual therapy was made by the Kaiser doctors because of Kaiser's standard and assertedly discriminatory practice of emphasizing group therapy over individual therapy without determinations regarding medical appropriateness of group therapy.

4. On page 19, in the second paragraph, in the fifth sentence (which begins with "Spivey was told"), insert at the beginning of the

sentence the language "According to plaintiffs, the evidence shows" so that the sentence reads:

> According to plaintiffs, the evidence shows Spivey was told that weekly therapy was "not available" at Kaiser and once her daughter no longer had weekly therapy, her condition worsened.

5. On page 20, in the paragraph that continues from page 19, in the next to last sentence (which begins with "She contacted her therapist"), replace the word "She" with the language "The evidence shows, plaintiffs contend, that she" so that the sentence reads:

> The evidence shows, plaintiffs contend, that she contacted her therapist requesting urgent individual therapy but was told she could only schedule a "couple" appointments with her.

The modifications effect no change in the judgment.

Dated:  June 6, 2023                                          BROWN, P. J.

Trial Court:      Superior Court of California, County of Alameda

Trial Judge:      Hon. Winifred Smith

Counsel:          Siegel LeWitter Malkani and Jonathan H. Siegel, Latika
                  Malkani, Laura Herron Weber for Plaintiffs and
                  Appellants.

                  Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S.
                  McCallum, Joseph E. Laska for Defendant and Respondent.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUSAN FUTTERMAN et al., <br><br>     Plaintiffs and Appellants, <br><br>         v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., <br><br>     Defendant and Respondent. | A162323 <br><br> (Alameda County <br> Super. Ct. No. RG13697775) |

Plaintiffs Susan Futterman, Maria Spivey, and Acianita Lucero appeal the summary judgment entered in favor of defendant Kaiser Foundation Health Plan, Inc. (the Plan) on their fourth amended complaint (complaint), which sought, on behalf of a proposed class, injunctive relief under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200), based on allegations that the Plan violates the California Mental Health Parity Act (Parity Act) (Health & Saf. Code,[1] § 1374.72) by failing to provide coverage for all medically necessary treatment of severe mental illness, and statutory penalties under the Unruh Civil Rights Act (Civ. Code, § 51), based on allegations that Kaiser intentionally discriminates against persons with

---

[1] All statutory references are to the Health and Safety Code unless otherwise noted.

1

disabilities by treating members with mental disabilities differently than members with physical disabilities.

On appeal, plaintiffs contend the trial court erred in entering judgment (1) on plaintiff Futterman's individual claims because triable issues of fact exist as to whether the Plan may be held liable for the acts of its subsidiary by whom Futterman's health care coverage was issued; (2) on the UCL cause of action because the court failed to consider how the Plan's own conduct undermines its formal contractual promises of covered treatment in violation of the Parity Act and (3) on the Unruh Civil Rights Act cause of action because triable issues of fact exist as to whether they were denied medically necessary treatment as a result of the Plan's intentional discrimination. We conclude the trial court properly entered summary judgment on Futterman's individual claims, but the court erred in entering summary judgment on the causes of action for violation of the UCL and for violation of the Unruh Civil Rights Act. Accordingly, we affirm the judgment as to Futterman but reverse the judgment in all other respects.

## I. BACKGROUND

The Plan is a nonprofit health care service plan subject to the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act) (§ 1340 et seq.) of which the Parity Act is a part. Under the Knox-Keene Act, a health care service plan "undertakes *to arrange for* the provision of health care services to subscribers or enrollees, or *to pay for* or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (§ 1345, subd. (f)(1), italics added.) Consistent with the provisions of the Knox-Keene Act, the Plan contracts with the Permanente Medical Group (TPMG) in Northern California and Permanente Medical Group in Southern California (SCPMG) to provide health care services to its members. (§ 1345, subd. (f)(1).)

2

The Plan's health coverage terms are set forth in the members' "Evidence of Coverage" (EOC). The Plan covers services if several conditions are satisfied, including that the services are "medically necessary"—defined in the EOC as "medically appropriate and required to prevent, diagnose, or treat your condition or clinical symptoms in accord with generally accepted professional standards of practice that are consistent with a standard of care in the medical community."

At the time of the filing of the complaint, the Parity Act provided in relevant part: "Every health care service plan contract . . . that provides hospital, medical, or surgical coverage shall provide coverage for the diagnosis and medically necessary treatment of severe mental illness of a person of any age, and of serious emotional disturbances of a child . . . under the same terms and conditions applied to other medical conditions." (Former § 1374.72, subd. (a), as amended by Stats. 2002, ch. 791, § 7; see *Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1238 [The Parity Act requires "treatment of mental illnesses sufficient to reach the same quality of care afforded physical illnesses."].) Former subdivision (d) of section 1374.72 defined severe mental illnesses to include a list of recognized disorders, including schizophrenia, bipolar disorder, major depressive disorders, panic disorder, anorexia nervosa, and bulimia nervosa. (Stats. 2002, ch. 791, § 7, p. 5045.)[2]

Plaintiffs' fourth amended complaint alleges, among other things, that the Plan violates the Parity Act by "[d]enying, dissuading and deterring members from obtaining one-on-one mental health therapy without making

_____

[2] The Parity Act was amended, effective January 1, 2021, to apply more broadly to the treatment of "mental health and substance use disorders." (Added by Stats. 2020, ch. 151, § 4.) The parties agree that the amendment does not affect plaintiffs' claim.

individualized determinations as to the medical necessity of one-on-one mental health therapy for individual members, and where similar policies and practices are not followed in the treatment of physical health conditions; [r]equiring, recommending, and/or encouraging 'group' therapy, without making individualized determinations as to the medical necessity or suitability of group therapy" and "without making individualized determinations as to the type of group therapy appropriate and medically necessary for individual members, and where similar policies and practices are not followed in the treatment of physical health conditions;" and "[a]ssigning members in need of mental health treatment to one-size-fits-all group-based [intensive outpatient programs] or similar programs, without making individualized medical determinations as to whether it is medically necessary or appropriate for the member, without tailoring the program to the member's individual medical need . . . where similar policies and practices are not followed in the treatment of physical health conditions." Plaintiffs' cause of action under the Unruh Civil Rights Act alleges that the Plan intentionally discriminates against persons with mental disabilities or conditions by treating them differently from people with physical disabilities or conditions.

The amended complaint describes at length the experiences of the three plaintiffs or their dependents illustrating these alleged deficiencies. In short, the deceased husband of plaintiff Susan Futterman, who had been "diagnosed as having bipolar disorder" and who ultimately committed suicide, was released following a 72-hour stay in an inpatient facility into a group-based intensive outpatient program. The complaint alleges, "No one individually assessed [him] for his suitability in the program, or the medical necessity of the program. The . . . program consisted of group therapy sessions four times

4

per week for the next six weeks and intermittent medication management. [He] was never offered individual psychotherapy as a treatment option. The group-based [intensive outpatient program] . . . is a one-size-fits-all program that is not tailored to the individual medical needs of particular patients or diagnoses." The program "consisted of a very large group of individuals, many of whom were recovering from substance abuse. [Futterman's husband] felt that he could not relate to the problems of these individuals who did not share his condition." When Futterman told Kaiser that she did not believe her husband was well-suited for group therapy, Kaiser told her that "was what was available."

Plaintiff Acianita Lucero, who had been "diagnosed as having major depression," was also "automatically pushed in group therapy and put into the group-based [intensive outpatient program] without any discussion about the possibility of one-on-one therapy as an alternative. There also was no assessment as to the suitability of group therapy or the type of group therapy that should be provided." During the course of her treatment, Lucero received "educational materials" from Kaiser that read, " 'We offer brief, problem solution-focused individual counseling . . . . We do not offer long-term individual psychotherapy at Kaiser.' " Her experience assertedly "is not uncommon for Kaiser members seeking mental health treatment" but "[s]imilar policies and practices are not followed in Kaiser's treatment of physical health conditions."

Plaintiff Maria Spivey's deceased minor daughter, who had been "diagnosed as having major depression, anxiety, and posttraumatic stress disorder," and who ultimately died by suicide, was "automatically referred . . . into [Kaiser's] group-based 'aftercare' program" following her completion of six weeks of inpatient treatment without "any kind of individual assessment"

5

of her condition. Her experiences assertedly "are illustrative of Kaiser's one-size-fits-all approach to mental health treatment that violates the Parity Act and Unruh [Civil Rights] Act. [She] was not individually assessed to determine whether the Aftercare program was medically necessary or an appropriate means to treat her mental health condition. Rather, she was automatically put into a group-based program upon release from the inpatient facility. At no point after her release from the inpatient program was [she] offered individual one-on-one counseling or assessed to determine whether one-on-one counseling was medically necessary or would have been a more appropriate way to treat her condition. The only individualized meetings that she had were for medication management."

In July 2020, this court issued an opinion reversing in part the trial court's denial of plaintiffs' motion for class certification. (*Futterman v. Kaiser Found. Health Plan, Inc.* (July 31, 2020, A155946) [nonpub. opn.].) In November 2020, the Plan moved for summary judgment. In February, after briefing and argument, the court granted the motion.

Initially, the court concluded that plaintiff Futterman, who had filed the complaint as a representative of her deceased husband, could not assert any claims against the Plan because her husband's health coverage was issued not by the Plan but by Kaiser Permanente Insurance Company (KPIC), a partially owned subsidiary of the Plan that is not named as a defendant in this action. With respect to the remaining plaintiffs' claims, the court concluded that the Plan was entitled to judgment as a matter of law. As to the UCL/Parity Act claim, the court concluded that the Plan's coverage contained in plaintiffs' EOC's satisfied the requirements of the Parity Act. The court explained that while the Plan and the medical groups "advertise themselves and consider themselves to be an integrated health care delivery

6

system," they are not treated as such under the statutes defining the roles and responsibilities of a health care service plan. The court continued, "The Knox-Keene Act consistently distinguishes between 'health care service plans' and 'providers' " and it "has different statutory definitions for the different entities and they have different statutory responsibilities. . . . The court will not muddle the statutory framework by treating a 'health care service plan' and its contracted 'providers' as a single integrated entity or as having a de facto principal-agent relationship." With respect to plaintiffs' claims under the Unruh Civil Rights Act, the court found that plaintiffs had not raised a triable issue of fact as to whether they were denied any contractual benefit for a discriminatory reason.

Plaintiffs timely filed a notice of appeal.

## II. DISCUSSION

### A. *The Trial Court Did Not Err in Entering Summary Judgment on Plaintiff Futterman's Individual Claims*

Plaintiff Futterman brings her claims as the representative of her husband and it is undisputed his health coverage was issued and underwritten not by the Plan but by KPIC, a separately incorporated company that is not named as a defendant in this action. The trial court summarily adjudicated Futterman's individual claims on the ground that the Plan did not provide Futterman or her husband with a "health care service plan contract." On appeal, Futterman concedes her husband contracted with KPIC, not the Plan, but argues that she presented sufficient evidence from which a fact finder could hold the Plan responsible for the acts of KPIC under a theory of alter ego. We review the trial court's ruling on a motion for summary judgment de novo. (*Gopal v. Kaiser Found. Health Plan, Inc.* (2016) 248 Cal.App.4th 425, 429.)

7

The undisputed facts establish that KPIC is a subsidiary of the Plan and that the Plan owns 50 percent of the voting stock of KPIC. The insurance contract between Futterman's husband and KPIC identified the Plan as a joint "Administrator" as well as "Premiums Collection Administrator" of his policy. As Futterman acknowledges, alter ego liability requires a unity of interest between the parent and the subsidiary, such that the separate personalities do not exist, and that an inequitable result would follow if the acts in question are treated as those of the subsidiary alone. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.) We need not decide whether the evidence submitted by Futterman is sufficient to create a material factual dispute regarding whether KPIC and the Plan share a sufficient unity of interest for purposes of alter ego liability because Futterman presented no evidence to support her assertion that not allowing her to pursue these claims against the Plan would be "an arbitrary and unjust result." As the Plan notes, Futterman does not contend that she or her husband were defrauded by KPIC's corporate form or that KPIC lacks the money to pay its own debts. Indeed, Futterman offers no explanation for why KPIC was not or could not have been named as a defendant in this action. Accordingly, insofar as Futterman failed to name the correct entity as a defendant, judgment was properly entered on her individual claims.

## B. *The Trial Court Erred in Entering Summary Judgment on the UCL Cause of Action*

Initially, for the first time on appeal, the Plan contends that plaintiffs Lucero and Spivey lack standing to assert a UCL claim. Relying on *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1345, it argues, " 'Because standing goes to the existence of a cause of action, lack of standing may be raised . . . at any time in the proceeding' and is 'not waived or forfeited' if raised for the first time on appeal." Plaintiffs reasonably counter that "[a]s a

8

practical matter, since [the Plan] did not move for summary adjudication and/or judgment based on allegations that plaintiffs, or any one of them, lacked standing, the parties' separate statements and record evidence do not address this issue." Given the lack of factual record, we briefly address only the Plan's contention that Lucero and Spivey failed to allege sufficient facts to establish standing under the UCL.

To have standing to pursue a claim under the UCL, a plaintiff must prove they "suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.) The standing requirement is intended to " 'preserve[] standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices.' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 321.) "[T]he quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact . . . . [F]ederal courts have reiterated that injury in fact is not a substantial or insurmountable hurdle; . . . Rather, it suffices for federal standing purposes to ' "allege[] some specific, 'identifiable trifle' of injury." ' " (*Id.* at pp. 324.)

The Plan argues that Lucero and Spivey failed to allege they suffered a sufficient economic injury as a result of any conduct by the Plan. It is undisputed, however, that they were Kaiser members with coverage under a contract issued by the Plan that was paid for by them or on their behalf. The complaint alleges they did not receive the coverage promised by the Plan because Kaiser had an actual and consistent practice of basing treatment decisions for severe mental illness on factors unrelated to medical necessity. (See *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 493 [plaintiff could prove a violation of the Parity Act "by showing that

9

Kaiser categorically denies coverage for mental health care services that may, in some circumstances, be medically necessary, and that Kaiser does so without considering whether such services are in fact medically necessary for its individual plan members"].) Overpayment for mental health coverage by members who sought mental health treatment is a nontrivial economic injury sufficient to confer standing. (See *Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at p. 323 [plaintiff may demonstrate economic injury by showing they "surrender[ed] in a transaction more . . . than he or she otherwise would have"].) Accordingly, the allegations of the complaint are sufficient to establish standing.

Plaintiffs contend a triable issue of fact exists as to whether the Plan violated the Parity Act. They argue, "The trial court's summary adjudication of the Parity Act claims is erroneous because it fails to look at how the Plan itself actually undermines its formal contractual promises of covered treatment, through the Plan's own conduct: its own negotiations, its funding, its involvement in staffing, and its overall integration with the exclusively contracted medical groups." They emphasize that they do not seek to hold the Plan vicariously liable for independent acts of the medical providers. Rather, they argue that the manner in which the Plan arranges and pays for mental health treatment limits patients' access to individual therapy thereby undermining the promised coverage. We agree.

Plaintiffs presented deposition testimony showing that the Plan negotiates with the medical groups and provides the financial resources for the staff at each medical center. One witness explained that the Plan's motto, "Our Model – Care and Coverage Together," means that "we have an integrated model, and the hospitals and the medical groups and the health plan work together to make sure that members get, as much as possible, all

10

the care under one roof."  The witness explained that the medical groups "get their budgets and they get their money from the health plan to provide services to [the Plan's] members."  The Plan acknowledges that it "negotiates with the Medical Groups, provides funding to pay for their services, and oversees the quality of care provided."

Plaintiffs presented evidence that Kaiser schedules patients in a manner that makes return or repeat appointments virtually impossible, and provides staff at levels that are insufficient to allow for frequent, individual therapy for patients who need it.  For example, plaintiffs presented declarations from providers detailing how their availability for individual therapy is limited by Kaiser's scheduling and staffing practices.  The providers explained that in making treatment plans for patients, they are "severely limited by availability of therapy appointments and treatment modalities within Kaiser's integrated, closed system."

One provider states, "Kaiser requires that I continue to regularly add new patients to my caseload at a rate of one or more per day.  Once a patient is under my care, I am responsible for providing them all medically necessary one-on-one therapy, and their access to that treatment is limited by my availability.  I currently am booked out approximately six to eight weeks for return therapy appointments, so my patients cannot receive one-on-one therapy more frequently than that.  For many of my patients with Parity Act conditions, frequent one-on-one therapy is an essential part of the medically necessary care to treat their conditions.  I have asked my manager to close my patient load so that I can have enough available appointments to provide therapy to my existing patients, but my requests have been denied or ignored."

11

The provider continues, "Kaiser's system of treatment for mental disorders, including Parity Act diagnoses, is based on a model that emphasizes group therapy, with much more limited access to one-on-one therapy. My schedule is regulated by Kaiser consistent with this emphasis on group therapy. Because of the long waiting times for individual return visits, I sometimes refer patients to group therapy because that is the only available modality for them to receive any therapy at the frequency medically necessary to treat their condition. For some patients with Parity Act conditions, such as those that are actively suicidal or have psychosis, group therapy is not clinically appropriate and frequent one-on-one therapy is medically necessary to treat them." Another provider repeats the above testimony and adds that "while I have determined that some of my patients require weekly or frequent one-on-one therapy, this form of therapy is not in practice available within Kaiser's closed system given current staffing levels."

Plaintiffs' evidence shows that once a patient is assigned to a particular provider, that clinician is responsible for providing all medically necessary one-on-one therapy to that patient. Kaiser has no written or consistent policy to ensure that patients receive care when their psychiatrists or therapists are on vacation. In addition, Kaiser's policy that "any patient that has received any contact with our department in the last two years is not considered a new patient" also poses a "barrier to patients receiving timely medically necessary treatment." Plaintiffs also submitted survey data which shows that a significant number of providers believe their facility does not have sufficient staff to provide patients with timely return visits and evidence of patients who filed complaints reporting an inability to access individual therapy at all or with any regularity.

12

Finally, plaintiffs presented evidence that the Plan has knowledge that the staffing levels are insufficient to provide for individual therapy if determined to be medically necessary. Internal Kaiser documents show that the Plan's staffing recommendations are inadequate to provide what both the Plan and its medical groups consider necessary for optimal patient outcomes.

The evidence submitted raises a triable issue of fact as to whether the Plan arranges and pays for mental health coverage in a way that limits access to individual therapy without consideration of a patient's medical necessity and thus it provides coverage for mental health illness differently than it provides coverage for physical illnesses. The Plan's arguments to the contrary are not persuasive.

The Plan argues that much of the above evidence is not temporally relevant to plaintiffs' claims and insufficient to establish that each individual plaintiff was denied medically necessary treatment because of the Plan's funding decisions. Plaintiffs' evidence, however, is sufficient to support an inference that decisions regarding individual treatment for all members, including plaintiffs, were based on criteria other than medical necessity. In addition, plaintiffs Spivey and Lucero submitted evidence, discussed *post* at page 19–20, supporting a reasonable inference that individual therapy was medically necessary for the treatment of their mental health illnesses. These inferences are sufficient to defeat summary judgment.

Similarly, the Plan emphasizes that it has taken steps to make sure out-of-network individual services are available to any member who needs them and that plaintiffs failed to request an out-of-network referral. While the existence of readily available out-of-network treatment might be sufficient to defeat plaintiffs' theory of liability at trial, for purposes of summary judgment, the Plan's evidence and argument in this regard only

13

serves to reinforce the conclusion that triable issues of fact exist. Indeed, as discussed *post* at p. 19, the record reflects that Spivey filed a formal grievance requesting individual therapy for her daughter but was asked to withdraw her grievance by the Plan. This evidence, if credited at trial, raises triable issues of fact both as to whether referrals were readily available and whether the Plan was on notice that members were being denied medically necessary individual services.

The Plan's remaining arguments are also unavailing. The Plan argues that plaintiffs cannot hold it vicariously liable for any alleged failure by the medical groups to provide medically necessary treatment to plaintiffs. They rely on section 1371.25 of the Knox-Keene Act which bars claims against a plan for vicarious liability, stating in relevant part: "A plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others." Plaintiffs, however, do not seek to hold the Plan vicariously liable for the acts of the medical groups. As stated above, plaintiffs' claim is that the Plan itself does not provide coverage as required by the Parity Act because it arranges and pays for medical treatment for severe mental illness at a different or insufficient level than it does for the treatment of physical illness.

*Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390 and *Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56 are distinguishable in that neither case involves a claim based on the health care service plan's direct liability. In both cases, the court held that section 1371.25 barred vicarious liability by a health care service plan for the acts and omissions of its medical group. In *Martin*, plaintiffs sought to hold the health care service plan vicariously liable for the medical provider's delay in

14

approving medically necessary treatment for their relative. (*Martin*, *supra*, 198 Cal.App.4th at p. 1398.) The court noted that plaintiffs' argument that the health care service plan was directly liable for "how it designed and implemented the standards and procedures it required [the providers] to use in performing the utilization review function" was rejected at trial based on a lack of evidence and not pursued on appeal. (*Id*. at p. 1408.) In *Watanabe,* plaintiff also sought to hold the health care service plan vicariously liable for the medical provider's failure to provide the plaintiff with necessary medical care. (*Watanabe*, *supra*, 169 Cal.App.4th at p. 62.) The court expressly noted that no evidence was presented at trial that the health care service plan committed an act or omission for which it would be directly liable. (*Id*. at p. 68.)

The Plan also argues that there is no legal support for plaintiffs' argument that the Plan is part of an integrated system such that it may be held liable under an alter ego or joint enterprise theory. The Plan emphasizes that the Knox-Keene Act expressly authorizes and encourages the corporate structure utilized by the Kaiser entities. (See § 1395, subd. (c) [authorizing health care service plan to "directly own, and . . . directly operate" hospitals and contract with physicians to provide health care to its members]; § 1342.6 ["Legislature finds and declares that it is in the public interest to promote various types of contracts between public or private payers of health care coverage, and institutional or professional providers of health care services"]; *Gopal v. Kaiser Found. Health Plan, Inc., supra*, 248 Cal.App.4th at p. 432 [finding joint enterprise doctrine inappropriate in part because the "close relationship" between the Plan and its providers is authorized by Knox-Keene and is necessary for the Plan to meet its obligations of a health plan to oversee and manage its providers per the

15

statutory requirements of Knox-Keene].)  The trial court seemingly agreed that the statutory authorization for Kaiser's integrated system precludes liability in this instance.  Plaintiffs do not argue, however, that Kaiser's integrated system provides a basis for alter ego liability.  Rather, their evidence regarding Kaiser's integrated system is intended to describe how the Plan is able to promise coverage based on medical necessity and then undermine that coverage so that members do not have equal access to certain treatment.  Acknowledging the context in which coverage is provided does not interfere with the Legislature's regulation of health care delivery systems under the Knox-Keene Act.

The cases cited by the trial court and defendant are distinguishable. In *Hambrick v. Healthcare Partners Medical Group, Inc.* (2015) 238 Cal.App.4th 124, 133, the trial court reasonably abstained from deciding whether a defendant was a de facto health care plan under the Knox-Keene Act.  In affirming the trial court's abstention, the appellate court held that "determination of [what criteria to use in defining a de facto health care service plan] is a regulatory decision involving complex economic policy considerations that should be made by [the Department of Managed Health Care (DMHC)], the regulatory agency tasked with interpreting and enforcing the Knox-Keene Act." (*Hambrick*, at p. 133.)  In *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301–1302, the court reversed an injunction entered by the trial court on the ground that the injunction invaded the regulatory scope of the Knox-Keene Act.  The court noted that provisions of the injunction requiring, for example, that a certain term be written "in plain English" and be given "greater prominence" sought improperly to enforce the authority of the state regulatory department. (*Samura*, *supra*, at p. 1301.)  The court explained, "The courts cannot assume

16

general regulatory powers over health maintenance organizations through the guise of enforcing Business and Professions Code section 17200. [Citation.] To the extent that the order on appeal is based on portions of the Knox-Keene Act having a purely regulatory import, it improperly invades the powers that the Legislature entrusted" to the governing regulatory department. (*Id*. at pp.1301–1302.)

Unlike in these cases, a finding here that the Plan violated the Parity Act would not interfere with the DMHC's regulatory authority. Plaintiffs do not dispute that the Plan can contract with providers and manage care for its members. Plaintiffs simply assert that the Plan cannot do so in a manner that undermines statutorily required coverage for mental health treatment. (See *Samura v. Kaiser Foundation Health Plan, Inc*., *supra*, 17 Cal.App.4th at p. 1299 [recognizing that actions under the UCL maybe be used to enjoin acts which are declared to be unlawful under the Knox-Keene Act].)

In sum, the evidence submitted in opposition to the Plan's motion for summary judgment raises a triable issue of fact as to whether the Plan is actually providing coverage for the treatment of severe mental illness in the same manner that it provides coverage for physical illness. Accordingly, the trial court erred in entering summary judgment in favor of the Plan on plaintiffs' claims under the UCL based on its violation of the Parity Act.

## C. *The Trial Court Erred in Entering Summary Judgment on the Cause of Action Under the Unruh Civil Rights Act*

The Unruh Civil Rights Act creates a civil cause of action for anyone who is "denied the right" to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever" on the basis of "their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status."

17

(Civ. Code, §§ 51, subd. (b), 52.) Except for claims under the act grounded in violations of the federal Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), the act requires proof of " '*intentional* acts of discrimination' " on any of the bases it specifies as prohibited; disparate impact alone will not suffice. (*Koebke v. Bernardo Heights County Club* (2005) 36 Cal.4th 824, 853–854.)

In our prior opinion in this case, which upheld the denial of class certification on plaintiffs' Unruh Civil Rights Act claims, we held that to recover under the act each plaintiff "would be required to establish that he or she was injured by the Plan's restrictive practices. A Kaiser member who did not need more extensive or one-on-one therapy would not have been injured by any failure to have provided more extensive treatment." (*Futterman v. Kaiser Found. Health Plan, Inc.*, *supra*, A155946.)[3]

---

[3] We note briefly that the standing requirements under the UCL and the Unruh Civil Rights Act are not the same. (See *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377, 1385 ["Standing requirements will vary from statute to statute based upon the intent of the Legislature and the purpose for which the particular statute was enacted."].) While standing under the UCL requires a nontrivial, economic injury in fact, discussed above, standing under the Unruh Civil Rights Act requires that the plaintiff "has been the victim of the defendant's discriminatory act." (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175, citing *Midpeninsula Citizens for Fair Housing v. Westwood Investors*, *supra*, 221 Cal.App.3d at pp. 1383, 1386, ["standing under the Act extends to persons 'actually denied full and equal treatment by a business establishment'—that is, to 'victims of the discriminatory practices' "].) In *Midpeninsula Citizens for Fair Housing v. Westwood Investors, supra,* 221 Cal.App.3d at page 1385, the court held that federal cases interpreting scope of standing requirements under federal discrimination laws, which require that a plaintiff meet the constitutional minima of showing an "injury in fact," do not expand the standing under the Unruh Civil Rights Act.

Here, the trial court entered judgment for the Plan, finding that plaintiff Lucero and plaintiff Spivey's daughter were not denied coverage for medically necessary treatment on a discriminatory basis. The Plan argues summary judgment was proper because "none of the individual Plaintiffs offered evidence to establish injury" and the "evidence does not remotely support an inference the Plan intended to discriminate against members with Parity Act conditions." We disagree.

To defeat summary judgment, Lucero and Spivey were not required to show that a Kaiser medical provider determined that individual therapy was medically necessary, only that a triable issue of fact exists as to whether such treatment was medically necessary. As they have argued, no determination of medical necessity for individual therapy was made by the Kaiser doctors because of Kaiser's standard and assertedly discriminatory practice of emphasizing group therapy over individual therapy without determinations regarding medical appropriateness of group therapy. As set forth more fully above, declarations by several Kaiser practitioners explained that "[f]or many patients with Parity Act diagnoses, frequent one-on-one outpatient therapy is an essential part of the medically necessary care to treat their conditions." Spivey presented evidence that her daughter received weekly individual therapy for approximately five years, through a non-Kaiser clinic because her providers determined weekly therapy was medically necessary for her but she was unable to access those services after her medical coverage changed. Spivey was told that weekly therapy was "not available" at Kaiser and once her daughter no longer had weekly therapy, her condition worsened. After her daughter was hospitalized following a suicide attempt, Spivey filed a formal grievance requesting "intense psychological therapy." She withdrew her request only after the Plan asked her to do so and placed her daughter in

19

a short-term residential treatment program. Plaintiff Lucero presented evidence that when she was first diagnosed with having a major depressive disorder in 2010, she received individual therapy with a Kaiser therapist over a period of several months. Within a few months, she was in remission. In 2012, however, her symptoms returned. The Kaiser mental health provider who evaluated her at the crisis clinic found that she was suffering from severe symptoms of major depression and needed urgent mental healthcare. Around this time, she was given a pamphlet that explained that long term individual therapy was not available at Kaiser; only group therapy was available. She contacted her therapist requesting urgent individual therapy but was told she could only schedule a "couple" appointments with her. Combined, this evidence raises a triable issue of fact as to whether individual therapy was medically necessary for Lucero and Spivey's daughter.

The evidence detailed above regarding how the Plan arranges and pays for mental health coverage supports an inference that the Plan intentionally underfunds mental health treatment and therefore raises a triable issue of fact as to whether it intentionally discriminates against patients with certain mental illnesses.[4] The trial court's reliance on Spivey and Lucero's failure to submit grievances asserting that their mental health providers were not providing covered services fails to recognize that the inference of intentional

_____

[4] The Plan's argument that such an inference cannot be drawn without additional evidence regarding "funding, staffing, scheduling, or treatment decisions for physical conditions" is not well taken. The Parity Act was enacted to remedy the fact that most health insurance plans were providing "coverage for mental illness at levels far below coverage for other physical illnesses," which had "resulted in inadequate treatment for persons with those [mental] illnesses." (Stats. 1999, ch. 534, § 1, p. 3702.) For purposes of summary judgment, the evidence that the Plan's decision not to fund its coverage at a level necessary to provide all medically necessary treatment for Parity Act conditions supports an inference of discrimination.

20

discrimination arises from the way the Plan arranges for the treatment of Parity Act conditions in the first instance, not how it handles grievances based on the denial of services.

Accordingly, the court erred in entering judgment in favor of the Plan on this cause of action.

## III.  DISPOSITION

We affirm the summary judgment entered on plaintiff Futterman's individual claims.  We reverse the summary judgment on the remaining plaintiffs' causes of action for violation of the UCL and for violation of the Unruh Civil Rights Act.  Plaintiffs shall recover their costs on appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
MILLER, J.

21

Filed 5/17/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUSAN FUTTERMAN et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., <br><br> Defendant and Respondent. | A162323 <br><br> (Alameda County Super. Ct. No. RG13697775) <br><br> ORDER GRANTING REQUESTS TO CERTIFY OPINION FOR PUBLICATION |

BY THE COURT\*:

The opinion in the above-entitled matter filed on April 25, 2023, was not certified for publication in the Official Reports. Latika Malkani of Siegel LeWitter Malkani, counsel for plaintiffs and appellants, Attorney General Rob Bonta, and San Diego City Attorney Mara W. Elliott, have filed requests that the opinion be published. Joseph Laska of Manatt, Phelps & Phillips, counsel for defendant and respondent, has filed a response opposing publication.

Having considered the arguments for and against publication, we have determined that publication is appropriate. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

Dated: May 17, 2023                 BROWN, P. J.

---

\* Brown, P. J., Streeter, J., Miller, J. (Associate Justice of Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution)

1

Trial Court:      Superior Court of California, County of Alameda

Trial Judge:     Hon. Winifred Smith

Counsel:         Siegel LeWitter Malkani and Jonathan H. Siegel, Latika
                 Malkani, Laura Herron Weber for Plaintiffs and
                 Appellants.

                 Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S.
                 McCallum, Joseph E. Laska for Defendant and Respondent.